OPINION OF THE COURT
Kaye, J.
This libel action, brought by a nonpublic figure against a newspaper publisher and reporter, tests the reach of Chapadeau v Utica Observer-Dispatch (38 NY2d 196). In Chapadeau this court held that “where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition,” a defamed party may recover damages only on a showing of gross irresponsibility (38 NY2d, p 199). Plaintiff asserts that defamatory statements about her, in an article concerning a State program which featured her former husband, fall outside the area defined by Chapadeau, and that a standard of simple negligence should determine defendant’s liability. We conclude both that the challenged statements are within Cha-padeau and that defendants were not grossly irresponsible, *346 and therefore reverse the order denying defendants’ motion for summary judgment and dismiss the complaint.
I
In July, 1977, defendant New York News Inc. published in the Daily News a series of five articles concerning the State’s program for transferring some 50,000 mental patients out of State mental hospitals, for continuing care in nursing homes. The series was written by defendant Marcia Kramer, a staff reporter. The fourth article, “Homing In On Institutions Where The Care Is Careless,” featured George Nies, a patient who had been transferred from a public mental hospital to a nursing home, and described his experiences in the home. The article opened as follows:
“When he was 41, George Nies, a Queens construction worker, suffered a nervous breakdown that psychiatrists said was precipitated by a messy divorce and the fact that his son killed himself because his mother dated other men.
“George was institutionalized, first in a Veteran’s Administration hospital and then in Creedmoor State Hospital for the mentally ill in Queens Village. After two years there, he appeared to be making progress.
“Then, without his family’s knowledge, state mental health officials discharged him and sent him to the Elm-hurst Manor Home for Adults, 100-30 Ditmars Boulevard, Flushing. Approximately half the residents of Elmhurst Manor are sane elderly men and women, the rest are discharged mental patients like George Nies.”
Plaintiff, Catherine Gaeta, the former wife of Nies, claims that the initial paragraph is false and defames her. She asserts that Nies did not suffer a nervous breakdown but that his hospital admission was precipitated by chronic alcoholism; that the divorce was not “messy” but was on consent; that their son did not commit suicide but died as a consequence of drug abuse long after his father’s initial hospitalization; that she did not date other men as alleged; and that none of the statements were made by psychiatrists. In her complaint plaintiff claims in addition that the statements were made with knowledge of their falsity or reckless disregard of the truth, and she seeks compensa *347 tory and punitive damages from the publisher and reporter.*
On plaintiff’s motion, Special Term struck from defendants’ answers the affirmative defense that the statements deal with matters of public concern requiring proof of gross irresponsibility, concluding that the standard of gross negligence is inapplicable because the statements regarding plaintiff had nothing to do with the treatment of nursing home patients; “the relationship between plaintiff and her son was not a matter of public interest, and was neither an integral nor a non integral part of the nursing home news story.” Citing this decision as law of the case, another Special Term Judge after discovery denied defendants’ motion for summary judgment. The court applied a simple negligence standard and concluded that defendants could be found negligent for not having made further inquiry in the circumstances. Moreover, the court allowed plaintiff’s punitive damages claim to stand, applying a standard of reckless disregard for the truth, since the case involves investigative reporting, where more time is available and greater care should be exercised.
The relevant facts regarding defendants’ investigation were drawn largely from the reporter’s deposition testimony. The reporter testified that she had spent approximately two months gathering information for the series. In the course of her research, George Nies was brought to her attention by sources in the office of Nursing Homes Special Prosecutor Charles J. Hynes. They referred Kramer to Dorothy Sorrentino, George Nies’ sister and, she believed, his legal guardian. Kramer was told that Sorrentino had previously proved to be a reliable source of information for the Special Prosecutor’s office. Kramer spoke to Sorrentino on the telephone two or three times, during which Nies’ treatment in the home as well as his psychiatric history were described. Sorrentino told Kramer that a psychiatrist had said that Nies’ nervous breakdown was caused by a messy divorce and the fact that his son had killed himself because his mother was dating other men. As Kramer *348 testified, since her article centered on Nies’ placement and care, and not his divorce, she did not inquire further about these personal details. She twice contacted psychiatrists at Creedmoor State Hospital, where Nies had previously been hospitalized, but they refused on the basis of patient-physician confidentiality to discuss his history, and suggested that she speak with Nies’ family or legal guardian. In an undercover capacity, Kramer visited the Elmhurst Manor Home for Adults, and observed conditions there firsthand, which confirmed the information about the home she had received from Sorrentino.
The Appellate Division, two Justices dissenting, affirmed the denial of defendants’ motion for summary judgment, agreeing that the gross irresponsibility standard of Chapadeau was inapplicable because the statements concerning plaintiff, remote in time and substance from the subject of the series, had no relationship to the balance of the article. The court concluded that the proof as to the investigation conducted and the degree of care exercised requires a weighing and balancing inappropriate for summary judgment, that even if the standard were gross irresponsibility there were factual issues present, and that the deliberate injection into a news story of a defamatory statement about a third party outside the sphere of public interest might rise to a higher level of reckless indifference and thus support an award of punitive damages.
Applicability of Chapadeau is thus called into question in two respects: first, are the challenged statements within the defined area requiring a higher standard of culpability? Second, has plaintiff raised a triable issue as to defendants’ gross irresponsibility? Since we answer the first question in the affirmative and the second in the negative, resulting in dismissal of the complaint, we do not reach the issue whether the statements are indeed defamatory, which defendants dispute, or whether plaintiff’s punitive damages claim should be dismissed for failure to show actual malice.
In striking a balance between the rights of private citizens to be protected against defamation and the constitutional guarantees of free speech and free press, this court *349 in Chapadeau imposed a higher standard of culpability when defamatory statements involve matters of genuine public concern. While there are no mechanical rules for identifying such subjects, matters involving the business of government clearly come within this category “for the rule requiring proof of fault in defamation actions rests upon the premise that the public needs to know those things which enable government to operate successfully.” (Cottom v Meredith Corp., 65 AD2d 165, 170 [Simons, J.].)
The Chapadeau standard, moreover, in describing the editorial content as to which the gross irresponsibility standard applies, recognizes the need for judgment and discretion to be exercised by the journalists, subject only to review by the courts to protect against clear abuses. Determining what editorial content is of legitimate public interest and concern is a function for editors. While not conclusive, “a commercial enterprise’s allocation of its resources to specific matters and its editorial determination of what is ‘newsworthy’, may be powerful evidence of the hold those subjects have on the public’s attention.” (Cottom v Meredith Corp., 65 AD2d 165, 170, supra.) The press, acting responsibly, and not the courts must make the ad hoc decisions as to what are matters of genuine public concern, and while subject to review, editorial judgments as to news content will not be second-guessed so long as they are sustainable. These considerations apply with equal force to the determination of what is “reasonably related to matters warranting public exposition” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra). Additionally, as with any test that measures the reasonable relationship of one thing to another, offending statements can only be viewed in the context of the writing as a whole, and not as disembodied words, phrases or sentences.
Turning now to the facts before us, it is clear that the series, and the article in question, deal with a subject of public business and concern, itself plainly warranting public exposition. No one seriously disputes that a State program for transfer of some 50,000 patients from public mental hospitals into nursing homes, and the subsequent experience of these individuals alongside the aged and infirm, is a subject of true public importance. Nor does the *350 familiar journalistic technique of featuring the experiences of a single individual, as exemplifying in human terms the plight of many, change the character of the article in issue. George Nies’ experience as a mental patient transferred, as part of a government program, to a nursing home, is a subject of legitimate public concern, reasonably related to matters warranting public exposition. In the context of an article focusing on one mental patient to portray a situation undeniably meriting public exposition, we cannot say that the causes of his initial confinement, and a chronology of his hospitalization, are not at least arguably a matter of legitimate public interest, and reasonably related to the major subject of the article. While perhaps distant in time, background details limited to George Nies’ illness and treatment are hardly remote from the subject of the article. From the face of the article, we find no abuse of editorial discretion and no disputed issue requiring submission to a jury. Since the offending sentence is within the area defined by Chapadeau where plaintiff in order to recover for defamation must prove gross irresponsibility, we next turn to the question whether plaintiff has raised a triable issue of fact as to defendants’ culpability.
Ill
Plaintiff has come forward with no evidence showing facts that would justify a jury in concluding that defendants had acted in a grossly irresponsible manner, and therefore summary judgment dismissing the complaint should have been granted. Before reaching the merits of this issue, we note that neither preliminary argument raised by plaintiff forecloses that result. First, the fact that supporting proof was placed before the court by way of an attorney’s affidavit annexing deposition testimony, rather than affidavits of fact on personal knowledge, does not defeat defendants’ right to summary judgment. (Zuckerman v City of New York, 49 NY2d 557, 563; O’Connor v G & R Packing Co., 53 NY2d 278, 283-284.) Second, while it may be argued that libel suits involving public figures are inappropriate for summary judgment because a plaintiff must demonstrate the subjective state of mind of the defendant, which does not readily lend itself to summary disposition (see, e.g., Hutchinson v Proxmire, 443 US *351 Ill, 120, n 9), here the standard may be satisfied by wholly objective proof. Defendants, like any other litigants, should not be denied summary judgment when an insufficient showing has been made in opposition to their motion. (Karaduman v Newsday, Inc., 51 NY2d 531, 545; see, also, Robart v Post-Standard, 52 NY2d 843; and Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, supra.)
Plaintiff has not raised a triable issue as to whether defendants “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196,199, supra.) Sorrentino had been described to Kramer as Nies’ legai guardian and a source who had previously furnished accurate information to the Nursing Homes Special Prosecutor. Sorrentino’s facts about her brother had inherent plausibility, and Kramer had no reason to suspect any animus toward the plaintiff. Kramer herself confirmed Sorrentino’s information about the nursing home by a visit there; no information could be secured from the psychiatrists at Creedmoor. Even though this was investigative reporting, free from the pressures and deadlines of live news, defendants cannot be said to have been grossly irresponsible in not making further inquiry. There was no reason to doubt the veracity of the information received from Sorrentino, and indeed good reason to believe it was accurate. (Robart v Post-Standard, 52 NY2d 843, supra; James v Gannett Co., 40 NY2d 415, 424.) Given that the reporter had no reason to suspect her source, and that she herself visited the nursing triable issue is raised as to defendants’ gross irresponsibility.
Accordingly, the order of the Appellate Division should be reversed, with costs, summary judgment for defendants granted, the complaint dismissed, and the certified question answered in the negative.
Chief Judge Cooke and Judges Jasen, Jones, Wacht-ler, Meyer and Simons concur.
Order reversed, with costs, appellants’ motion for summary judgment granted, complaint as against appellants dismissed, and question certified answered in the negative.

 The former editor and publisher, also named as defendants, were dismissed from the suit on the ground that they played no affirmative role in the article, and no appeal was taken from that decision.