**Paul and Anna BROAD, Plaintiffs,**

v.

**William F. CONWAY, Robert H. Iseman, and DeGraff, Foy, Conway, Holt–Harris & Mealey, Defendants.**

No. 87–CV–1331.

United States District Court, N.D. New York.

Dec. 23, 1987.

Paul and Anna Broad, pro se.

Roche, Corrigan, McCoy & Bush, Robert P. Roche, Albany, N.Y., for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiffs, Paul and Anna Broad, commenced this action against the law firm of DeGraff, Foy, Conway, Holt–Harris & Mealey ("the DeGraff firm") and two partners in that firm, William Conway and Robert Iseman, basically alleging legal malpractice by those defendants. Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ. 56. For the reasons discussed herein, defendants' motion is granted.

## BACKGROUND

In June of 1982, plaintiffs contacted William Conway, a partner in the DeGraff firm, regarding the possibility of commencing a lawsuit against a television station and several of its reporters for a news broadcast, which plaintiffs claimed was libelous. In particular, plaintiffs believed that the news broadcast was libelous because it implied that their treatment of Elena Zhilinskaya, Mrs. Broad's daughter and Mr. Broad's stepdaughter, may have contributed to her death which was initially thought to be a suicide. (Apparently, investigation into Ms. Zhilinskaya's death now remains an open homicide case with the Albany police.)

According to Mr. Conway, after being contacted by plaintiffs, he met with them and informed them that his firm would make a "preliminary assessment" as to the merits of their case. Conway Affidavit (10/30/87) at ¶ 3. He then asked Mr. Iseman, another partner with the DeGraff firm, to determine whether plaintiffs had a meritorious case, and if they did, Mr. Iseman was to handle the case. Conway Affidavit at ¶ 4 and Iseman Affidavit (10/30/87) at ¶ 8. After determining that plaintiffs did have a meritorious claim, Mr. Iseman proceeded to handle their case. During that time, he kept Mr. Conway apprised of the progress of plaintiffs' case, and that conduct was consistent with Mr. Conway's statement to plaintiffs that he would keep abreast of their case and confer with the assigned attorney, as was the office policy. Conway Affidavit at ¶ 7.

Throughout Mr. Iseman's handling of the case, Mr. Conway claims that he never received any complaints from plaintiffs regarding Mr. Iseman's handling of their case. Conway Affidavit at ¶ 6. Nor did plaintiffs ever express any dissatisfaction to Mr. Iseman regarding his handling of the case, until it was called for trial. Iseman Reply Affidavit (12/1/87) at ¶ 4. Plaintiffs claim in their complaint, however, that they were "not impressed with Mr. Iseman's handling of our case but were patiently waiting for Mr. Conway to take over the case as he promised at the time of the engagement." Complaint at ¶ 4.

When the case was finally called for trial, the plaintiffs informed Judge Gagliardi in chambers that they had lost trust and confidence in Mr. Iseman and that they believed Mr. Iseman had become part of the "conspiracy" against them to cover up the cause of Ms. Zhilinskaya's death. TR. 2 at p. 2.[1] Despite that alleged loss of

---

1. In support of their summary judgment motion defendants submitted two transcripts from the proceedings before the Honorable Lee P. Gagliardi, United States District Court Judge. The first was a transcript in the case of *Broad v. General Electric Broadcasting Company, Inc., et al.,* 82–CV–1236. That transcript sets forth the settlement stipulation entered into by the parties to that action in open court on September 17, 1985; and it was attached as Exhibit "E" to

Mr. Iseman's affidavit submitted in support of defendants' motion. That transcript will be referred to herein as "TR. 1."

The second transcript is also from the above referenced case, and it sets forth the proceedings which took place in chambers on September 17, 1985. Judge Gagliardi, plaintiffs' counsel, Mr. Iseman, and plaintiffs were present at that time. The transcript of that matter is at-

trust and confidence in their attorney, plaintiffs did not discharge Mr. Iseman nor the DeGraff firm.

Plaintiffs did express their concern to Judge Gagliardi at that conference in chambers, however. Specifically, Mr. Broad stated:

We did not hire as our attorney Mr. Iseman. We hired Mr. Conway. Mr. Conway told me that Mr. Iseman will do only the preparatory work. Since Mr. Conway is not representing us in the Court and other developments in our case and since you, your Honor, cannot grant us a postponement of the trial, we are forced to accept the defendant's (sic) offer. We feel, however, your Honor, that Mr. Conway's absence in the Court and the conduct of our attorneys is a betrayal of our confidence. Moreover, we feel that it is a part of the conspiracy to cover up the murder of our daughter.

TR. 2 at p. 2. Nevertheless, plaintiffs went ahead with a settlement in which Mr. Broad had significant input. *See* TR. 1. Eventually, plaintiffs' lawsuit was settled for $25,000.00 and a public apology by the television station; a settlement that Mr. Conway described as "even more favorable" than he thought possible when he had conferred with plaintiffs prior to trial. Conway Affidavit at ¶ 14.

The settlement was put on the record. Before that was done, however, Judge Gagliardi instructed plaintiffs to listen "attentively" to the settlement, because after it was on the record, he was going to ask plaintiffs whether it was their "own voluntary desire" to settle the matter. TR. 1 at p. 102. When the Judge asked plaintiffs if they understood that instruction, Mr. Broad responded, "Yes, your Honor." *Id.* at p. 2. After defense counsel put the settlement on the record, Judge Gagliardi asked the plaintiffs whether they were satisfied with the settlement and they said that they were. TR. 1 at p. 8. Then the Judge specifically asked plaintiffs whether

they were coerced into settling their action, and plaintiffs stated that they were not. *Id.* Approximately three weeks after plaintiffs agreed to that settlement in open court, they executed a general release and returned it to the DeGraff firm. Iseman Affidavit, Ex. "G". Subsequently, plaintiffs received $18,491.95 as their net recovery.

Plaintiffs then commenced the present action alleging that the defendants "forced" them into accepting the settlement offer. Complaint at ¶ 9.[2] Plaintiffs further alleged that Mr. Conway failed to represent them "as [they] agreed to," and that Mr. Conway and Mr. Iseman recklessly handled their case. *Id.* at ¶ 10.

Defendants are now moving for summary judgment arguing first that such relief is proper because plaintiffs voluntarily and unconditionally settled their libel action on the record, in open court, and thus, plaintiffs are estopped from asserting now that they were coerced into settling. Second, defendants argue that even assuming plaintiffs were coerced into settling, plaintiffs cannot establish the necessary elements of a legal malpractice action.

## DISCUSSION

*Pro se* complaints are to be liberally construed. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) (per curiam); *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). A liberal construction of the complaint in this case indicates that plaintiffs are apparently alleging a cause of action based upon legal malpractice against these defendants. There are two aspects to that malpractice claim. The first is that defendants allegedly "forced" plaintiffs into settling the underlying action. The second seems to be based upon some sort of malfeasance of misfeasance by defendants, described by the plaintiffs as the "recless" [sic] handling of their case.

tached as Exhibit "A" to Mr. Iseman's Reply Affidavit (12/1/87), and will be referred to herein as "TR. 2."

2. Although plaintiffs did not number the paragraphs of their complaint, the court has taken the liberty of doing so for the sake of convenience.

Finally, there is a possibility that plaintiffs have also stated a cause of action for breach of contract by alleging that they retained Mr. Conway, but that he did not handle their case, as plaintiffs allege was the agreement between them.

## I. *The Settlement*

 Turning to the coercion issue, the first consideration is the effect on the present action of plaintiffs' settlement of the underlying action. Although not expressly stated by defendants, there are actually two components to their argument regarding plaintiffs' settlement of the underlying action. The first is that plaintiffs are barred from bringing this action based upon the prior settlement. It has been recognized, however, that a plaintiff's legal malpractice cause of action "must stand or fall on its own merits, and there is no automatic waiver, as a matter of law," of plaintiff's right to sue. *N.A. Kerson Company, Inc. v. Shayne, Dachs, Etc.,* 59 A.D. 2d 551, 552, 397 N.Y.S.2d 142, 144 (2nd Dep't 1977), *aff'd on concurring opinion of Suozzi, J.,* 45 N.Y.2d 730, 408 N.Y.S.2d 475, 380 N.E.2d 302 (1978). *Cf. Mazzei v. Pokorny, Schrenzel & Pokorny,* 125 A.D. 2d 374, 375, 509 N.Y.S.2d 100, 101 (2nd Dep't 1986) (General release executed by plaintiff in underlying action does not preclude him from bringing subsequent legal malpractice action.) That is true even if plaintiffs voluntarily settled the underlying action. *Kerson, supra,* 397 N.Y.S.2d at 144. Therefore, contrary to defendants' assertion, the fact that plaintiffs voluntarily settled the underlying action does not preclude them from bringing the present legal malpractice action.

 The second component of defendants' argument regarding the settlement is, however, meritorious. In particular, defendants contend that because plaintiffs did not raise the issue of coercion at the time of settlement, and, in fact, indicated the exact opposite to Judge Gagliardi in open court, plaintiffs are estopped from raising that issue on this summary judgment motion.

In *Owens v. Lombardi,* 41 A.D.2d 438, 343 N.Y.S.2d 978 (4th Dep't 1973), a case relied upon by defendants, the terms of a stipulation involving a real estate matter were read into the record before the judge, in chambers. At the time of the settlement, the plaintiff husband was present, but not his wife, who was also a plaintiff. Several months later the court refused to vacate that settlement on plaintiffs' motion. The court held that the plaintiff wife was estopped from raising a claim that her attorney had exceeded the scope of his authority in settling the case on her behalf. *Id.* at 441, 343 N.Y.S.2d at 982. The court further held that the plaintiff wife was estopped from raising a claim that the settlement did not express her true intentions. *Id.*

Applying that rule to the present case, plaintiffs are now estopped from raising an issue as to whether they were coerced into settling the underlying action. After defense counsel stated the terms of the settlement on the record, plaintiffs were explicitly asked by Judge Gagliardi, in open court, on the record:

> THE COURT: Is that satisfactory, Mr. Broad?
>
> MR. BROAD: Yes, sir.
>
> THE COURT: Mrs. Broad?
>
> MRS. BROAD: Yes.
>
> THE COURT: And no coercion or influence has been exerted upon you by anyone to enable you to arrive at this disposition; is that correct?
>
> MR. BROAD: Correct, your Honor.
>
> THE COURT: Mrs. Broad?
>
> MRS. BROAD: Yes.

TR. 1 at p. 8. As previously noted, although plaintiffs did express some concern regarding their attorneys to Judge Gagliardi at the conference in chambers prior to reading the settlement into the record, at no time did they request that the DeGraff firm withdraw from their case.

Furthermore, it is evident from a reading of the transcript that Judge Gagliardi, aware of plaintiffs' concern, took every step to insure that plaintiffs were not settling their case because they felt compelled to from some outside source. For example,

at the start of the proceeding where the settlement was put on the record, Judge Gagliardi specifically instructed plaintiffs as follows:

All right. Mr. and Mrs. Broad, will you listen to the proposition that Mr. Sabo, on behalf of the Defendants, is making which I wish you to listen to attentively, and after it is on the record, I'm going to ask you if you agree to it, and I'm going to ask you if this is your own voluntary desire to dispose of this matter in this manner. Do you understand?

TR. 1 at p. 1–2. In addition, repeatedly throughout the settlement proceeding, the Judge asked plaintiffs if certain provisions of the settlement were satisfactory to them, and they responded affirmatively. *See*, TR. 1. Further, Mr. Broad himself was actively involved in negotiating the settlement while it was being placed on the record. *Id.*

If these plaintiffs did not want to settle, they had ample opportunity to discharge their attorneys and proceed to trial with other counsel. In plaintiffs' papers in opposition to this motion, plaintiffs claim that they requested of Judge Gagliardi that the trial be postponed "to replace our attorneys." The quoted language was added, however, by plaintiffs for purposes of this motion. There is absolutely no mention in the transcript, either in chambers, or in open court, that plaintiffs asked Judge Gagliardi for an adjournment to obtain new counsel. While at this point plaintiffs may wish that they had made such a request, the fact remains that they did not.

Under these circumstances, plaintiffs cannot now disavow the plain and unequivocal terms of the settlement, which they entered into voluntarily on the record, in open court. As defendants correctly noted, allowing plaintiffs to disavow a voluntary settlement made on the record in open court would "wreak havoc" with the judicial system. Not only would defense counsel be more reluctant to settle, out of fear that those settlements would later be set aside simply because plaintiffs changed their minds, but the attorney client relationship would also be undermined. Plain-

tiffs' attorneys would also be more reluctant to settle, because even if their clients agreed to a voluntary settlement, plaintiffs' counsel would be concerned that plaintiffs would sue them for malpractice at a later date.

Therefore, because the plaintiffs expressly stated on the record, in open court, that they were not coerced or influenced to settle, plaintiffs are precluded here from claiming that there is an issue of fact as to whether they voluntarily settled the underlying action. Thus, insofar as plaintiffs complaint alleges a legal malpractice claim based upon coercion, that claim must necessarily fail. But, even assuming that plaintiffs were coerced into settling, as discussed in section II, plaintiffs have nevertheless failed to establish the necessary elements of a legal malpractice action.

## II. *The Merits of the Legal Malpractice Action*

Although *pro se* complaints must be liberally construed, the Second Circuit has recognized that "[A]t some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief." *Salahuddin v. Coughlin*, 781 F.2d 24, 29 (2d Cir.1986). The Court further stated, "The summary judgment stage is an appropriate juncture to identify the real issues in a case." *Id.* (citation omitted). Here, plaintiffs have failed to show facts sufficient to establish that they are entitled to relief.

It is well settled that an action for legal malpractice requires proof that negligence by the attorney proximately caused the loss sustained and proof of actual damages. *Hanlin v. Mitchelson*, 623 F.Supp. 452, 455 (S.D.N.Y.1985) (and cases cited therein). Accordingly, to prevail in a legal malpractice action, a plaintiff must show that but for the alleged acts of malpractice, he would have been able to recover or proceed in a manner other than that which actually occurred. *Id.* at 456 (and cases cited therein).

■ Here, plaintiffs have not demonstrated that the result would have been

different if the case had been handled differently. First, even assuming that plaintiffs were "forced" to settle the underlying action, they have not made any allegations which would tend to show that they would have been able to recover or proceed in a manner other than that which actually occurred. In fact, as defendants accurately pointed out, plaintiffs, in their complaint, allege that Mr. Conway was "pressing" them to settle. And, the settlement figures being bandied about at that time, when Mr. Conway was involved, were substantially less than the $25,000 plaintiffs ultimately received. Initially, the defendants in the underlying action were only willing to settle for a modest amount (less than $10,000). Iseman Affidavit at ¶ 28.

Further, Mr. Conway states that prior to trial he advised plaintiffs that if a settlement could be negotiated clearing their name, they should give "serious consideration to accepting it, even if it only involved the payment of nominal money damages." Conway Affidavit at ¶ 12. Finally, he avers:

> Based upon Mr. Iseman's status reports to me during the course of the litigation and my reading of his affidavit before the court, I can say unequivocally that the plaintiffs received representation of the highest quality and that I would not have proceeded differently if I had personally handled the plaintiffs' claim.

*Id.* at ¶ 14. Thus, it is clear that even if Mr. Conway had handled plaintiffs' case (as plaintiffs assert he was obligated to do), and accompanied them to court on the day the case was settled, the case would not have been handled differently. In fact, in light of Mr. Conway's statement that he recommended that plaintiffs give "serious consideration" to payment of a nominal amount, there is a possibility that if he had personally represented plaintiffs at the last stages of settlement, the amount recovered on their behalf would have been substantially less than the amount actually recovered.

Further, plaintiffs are unable to point to any facts demonstrating that the result would have been more favorable if the case had not been settled. Given the state of New York libel law when this case was called for trial, there is a strong likelihood that defendants would have been entitled to a directed verdict at the close of the plaintiffs' case.

In *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975), the Court of Appeals held that in libel actions involving matters of public concern, plaintiffs have the burden of showing that the reporter acted in a "grossly irresponsible manner." *Id.* at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64. In *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984), the Court strictly applied the gross irresponsibility standard previously articulated. Specifically, in *Gaeta,* the Court held that articles regarding the particular circumstances surrounding the hospitalization and transfer of a mental patient to a nursing home constituted a matter of legitimate public concern. *Id.* at 350–51, 465 N.E.2d at 803–04, 477 N.Y.S.2d at 85–86. The Court then considered whether the reporter's reliance on one source—the patient's sister—was gross irresponsibility. The Court concluded that such reliance was not gross irresponsibility. Finally, the *Gaeta* Court explained that because the gross irresponsibility test is an objective one, summary judgment thereunder may be appropriate in certain instances. *Id.* at 350–51, 465 N.E.2d at 803–04, 477 N.Y.S.2d at 86. The Court held that summary judgment dismissing the complaint should have been granted therein because the plaintiff failed to come forth with any facts that would enable a jury to conclude that defendants were grossly irresponsible.

Defendants correctly contend that the significance of the *Gaeta* case on plaintiffs' underlying action cannot be ignored. Plaintiffs simply assert in their opposing papers that *Gaeta* had no "relevance" to their underlying action. At oral argument, Mr. Broad attempted to distinguish *Gaeta* on its facts. Those factual distinctions are inconsequential, however.

After *Gaeta*, there is little doubt that Ms. Zhilinskaya's alleged family relationships would be relevant to the circumstances surrounding her death, and that those matters were of legitimate public concern. Thus, in the underlying action plaintiffs had the burden of showing that the reporter was grossly irresponsible, a burden they could not sustain.

Unlike *Gaeta*, where the reporter had only *one* source, discovery revealed that the reporter in plaintiffs' underlying action had four different sources: the Albany County Coroner; the Albany City Police Department; Angelo Cuprill (one of Ms. Zhilinskaya's neighbors); and Mrs. Broad's former husband, Lev Levitin, and those sources corroborated each other. Sanders Deposition (12/30/82) at pp. 46, 55, 58–60. After further investigating the story, the reporter decided the story could be aired. At her deposition, the reporter explained her reasoning:

> It's—every—the story of her life and depression had a commonality between what Caprill, Levitin and the police had said. There was no discrepancy in what people were saying the girl's life was like. If Levitin had disputed everything Caprill had said or if the police had not said to me yes, we've been out to investigate, there might have been some red flag that might go up for me that somebody might not be telling the truth here. But there was no reason for me to believe that.

*Id.* at 73. Therefore, based upon the foregoing, clearly plaintiffs would not have been able to show the necessary gross irresponsibility. Indeed, the facts of plaintiffs' case were even more favorable to the reporter than in *Gaeta*, where the court found summary judgment proper because there was no showing of gross irresponsibility by that reporter. Thus, in light of *Gaeta*, it seems highly unlikely, if not impossible, that plaintiffs would have prevailed on their case at trial. *See also, Robart v. Post Standard*, 74 A.D.2d 963, 425 N.Y.S.2d 891 (3rd Dep't 1980), *aff'd*, 52 N.Y.2d 843, 418 N.E.2d 664, 437 N.Y.S.2d 71 (1981) (Summary judgment and dismissal of the complaint proper where reporter relied upon a reasonable source, the police, even though the information provided and published was inaccurate.)

Furthermore, even assuming plaintiffs had survived a motion for a directed verdict in the underlying action, they have not met their burden of showing actual damages, an essential element of a legal malpractice action. For example, in *Becker v. Julien, et al.*, 95 Misc.2d 64, 406 N.Y.S.2d 412 (Sup.Ct., N.Y.Co.1977), *mod'd on other grounds*, 66 A.D.2d 674, 411 N.Y.S.2d 17 (1st Dep't 1978), *appeal dismissed*, 47 N.Y. 2d 761, 391 N.E.2d 300, 417 N.Y.S.2d 464 (1979), the court dismissed that portion of plaintiff's complaint alleging legal malpractice stating:

> Plaintiff has not made even the scantiest showing that the value of his claim, prior to the alleged "improvident and coerced" settlement exceeded $45,000. Indeed, there appears to be a strong possibility that his case might have been dismissed entirely.

*Id.* 95 Misc.2d at 68, 406 N.Y.S.2d at 414–15. Similarly, in *Ressis v. Wojick*, 105 A.D.2d 565, 481 N.Y.S.2d 507 (3rd Dep't 1984), *mtn. for leave to appeal denied*, 64 N.Y.2d 609, 478 N.E.2d 210, 489 N.Y.S.2d 1026 (1985), the court dismissed plaintiff's complaint alleging legal malpractice where plaintiff failed to allege, either in his complaint or in his affidavit in opposition to the summary judgment motion, any facts to justify an award of compensatory damages. The court reasoned, "Absent proof of actual damages, a claim for attorney malpractice is unsupportable." 105 A.D.2d at 567, 481 N.Y.S.2d at 509 (citation omitted). Here, the plaintiffs have also failed to come forth with any allegations tending to show that they sustained actual damages as a result of defendants' alleged malpractice. Consequently, in the absence of such allegations, plaintiffs' legal malpractice claims must fail.

In conclusion, assuming *arguendo* that plaintiffs were coerced into settling the underlying action, nevertheless, plaintiffs have not sustained their burden of proof on this motion for summary judgment. Plaintiffs have failed to bring any facts to the

court's attention showing that they would have been able to proceed or recover in a manner other than that which actually occurred. Additionally, plaintiffs have failed to make any allegations, either in their complaint or in their opposing papers which would establish that they sustained compensatory damages as a result of defendants' alleged malpractice. Based on the foregoing, defendants' motion for summary judgment is granted with respect to plaintiffs' claims of legal malpractice.

### III. *Breach of Contract*

■ Finally, to the extent plaintiffs have attempted to assert a breach of contract claim based upon the fact that Mr. Conway did not handle their case, plaintiffs have also failed to come forth with facts sufficient to support that claim. As discussed herein, there is absolutely nothing before this court showing that Mr. Conway would have handled plaintiffs' case any differently than did Mr. Iseman. Indeed, the evidence before this court is to the contrary. Mr. Conway specifically averred that he "would not have proceeded differently if [he] had personally handled the plaintiffs' claim." Conway Affidavit at ¶ 14. Moreover, plaintiffs have failed to put forth any evidence whatsoever showing that they sustained any damages due to Mr. Conway's failure to handle their case. In fact, as discussed above, it is entirely possible that if Mr. Conway had handled their case, plaintiffs might not have recovered as much as they did. Therefore, because plaintiffs have failed to put forth any evidence establishing breach of contract, defendants' motion for summary judgment is also granted with respect to that cause of action.

Accordingly, defendants' motion for summary judgment is granted in its entirety, and plaintiffs' complaint is hereby dismissed.

IT IS SO ORDERED.