■ ALTAGRACIA CRUCEY, Respondent, v ROBERT JACKALL et al., Appellants. [713 NYS2d 20] —Order, Supreme Court, New York County (Louise Gruner Gans, J.), entered on or about July 2, 1999, which denied defendants' motion to dismiss the complaint, reversed, on the law, without costs, the motion granted and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint.

In this action, plaintiff alleges that defendants defamed her in a nonfiction book about gang activity entitled the "Wild Cowboys: Urban Marauders & the Forces of Order." It is uncontroverted that the statements at issue had their genesis in an investigation conducted by various elected officials, the results of which were ultimately included in the Congressional Record. The investigation had been prompted by a desire to clear the name of a highly decorated Immigration and Naturalization Service agent. This agent, it was believed, had been wrongly convicted on perjured testimony—testimony that allegedly was orchestrated by certain criminal elements seeking to eliminate the agent as a threat to their enterprises.

Since it is unequivocally clear that defendants did not act

with gross irresponsibility, dismissal of the complaint is warranted (*see, Gaeta v New York News*, 62 NY2d 340, 345, citing *Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199). In view of this, it is unnecessary to determine whether the investigation at issue constituted an "official proceeding" for purposes of Civil Rights Law § 74. Concur—Ellerin, J. P., Buckley and Friedman, JJ.

Saxe, J., concurs in a memorandum as follows: Although our law accords absolute immunity for the publication of fair and true reports of "official proceeding[s]" (Civil Rights Law § 74), the parties disagree as to whether the private investigatory activities instituted by a New York City Borough President, the resulting evidence of which was published in the Congressional Record by two members of Congress, constitute official proceedings. Because this sharply disputed issue is of importance to the publishing industry, and was the primary issue on appeal, I believe it to be worthy of discussion by this Court.

This defamation action centers on statements about plaintiff published in a book entitled "Wild Cowboys: Urban Marauders & the Forces of Order," written by defendant Robert Jackall, a professor of sociology at Williams College, and published by defendant Harvard University Press. The book is a nonfiction account of a gang referred to as "Wild Cowboys" and of drug dealing primarily in the Washington Heights and South Bronx sections of New York City.

One section of the book contains passages pertaining to a former agent for the Immigration and Naturalization Service (INS), Joseph Occhipinti, who, in the late 1980s, launched an investigation called "Operation Bodega," targeting small grocery stores in search of undocumented foreign nationals and any other illegal activity occurring on the premises. In the course of this investigation, on August 24, 1989, the small grocery store belonging to plaintiff, Altagracia Crucey, was subjected to a warrantless search, yielding, *inter alia*, a handgun and some gambling records. After speaking with Occhipinti, plaintiff signed an affidavit, in English, admitting to her knowledge of, or participation in, certain criminal activities; however, she thereafter took the position that she was not sufficiently fluent in English to understand the contents of the affidavit she signed.

Thereafter, plaintiff and a number of other bodega owners challenged Occhipinti's activities, testifying that he had conducted illegal searches and seizures. In 1991 Occhipinti was indicted and ultimately convicted of making false statements in INS reports and of violating the civil rights of 12

bodega owners, including plaintiff, who testified against him. He was sentenced to 37 months' imprisonment (although his sentence was commuted by President George Bush after seven months).

Plaintiff's criminal conviction for weapon possession was thereafter vacated, on motion of the Manhattan District Attorney's Office, on the ground that the conviction was the result of perjured testimony provided by Occhipinti and from an illegal search.

Following Occhipinti's conviction, Guy Molinari, then-Staten Island Borough President, along with Ohio Congressman James A. Traficant, Jr., and then-Congresswoman Susan Molinari, initiated a campaign in an (unsuccessful) attempt to exonerate the highly decorated INS agent. These public officials commenced an investigation into the facts and circumstances surrounding his indictment and conviction, believing that the witnesses, including plaintiff, had perjured themselves while testifying against Occhipinti in order to remove him as a threat to their illegal activities.

The information obtained from this investigation, including affidavits of persons questioned in the course of the investigation, was then published in the Congressional Record by Congressman Traficant. These affidavits were the source of information for the challenged statements that Jackall included in his book.

The complaint sets forth the following excerpts from the book, underlining the portions containing the allegedly defamatory statements about plaintiff.

"1. In early 1992 [Molinari's Chief Investigator Ray] Hagemann became acquainted with one Ramon Rodriguez, formerly on the DEA payroll as an informant paid by the piece, plus expenses, for information he provided. Rodriguez told Hagemann that he had personal contacts and dealings with Jose Liberato, Jose Elias Taveras, and Jose Prado, as well as with Leonides Liberator and Altagracia Crucey, all key trial witnesses against Occhipinti. Rodriguez provided Hagemann with a sworn affidavit dated April 21, 1992, describing several of these interactions.

"Rodriguez had had a conversation with Elias Taveras in November of 1991. His affidavit states: 'Mr. Taveras was bragging to me how he was responsible in convicting a federal agent from Immigration for stealing money and doing an illegal search of his bodega. He personally admitted to me that he lied to the jury about the theft of monies and the illegal searches. Mr. Taveras also told me that a Dominican woman called Alta-

gracia Crucey, who owns a bodega on Broadway near West 162nd Street * * * also falsely testified against the Immigration officer.' In characterizing Taveras and Crucey, the affidavit states that 'Taveras is involved in the sale of numbers, gambling, illegal drug money transfers to the Dominican Republic, and also arranging drug sales' and that three Dominican drug dealers all had admitted to them that Altagracia Crucey was their source of heroin.

"2. According to the [Ramon Rodriguez] affidavit, [Jose] Liberato said that he and others organized many of the bodega owners to testify falsely against the officer.

"3. According to the Hagemann affidavit, Rodriguez produced a tape of a conversation which, he claimed, contains the voice of Jose Prado in which Prado admitted receiving $35,000 to testify falsely against Occhipinti. On that same tape, Prado also implicated Jose Liberato, Altagracia Crucey, Rhadames Liberato and others in perjury.

"4. Two other men also made undercover forays into the bodegas owned by Occhipinti's main accusers. Hector Rodriguez worked for Molinari's office under Hagemann's supervision and, he reports in an affidavit printed in the March 17, 1994 Congressional Record, discovered * * * narcotics trafficking in the Crucey grocery."

It is not disputed that virtually all of the documentary sources for the information contained in the passages listed above, namely, the affidavits of investigators and informants, were reprinted or read verbatim into various editions of the Congressional Record. Specifically, the first and second passages listed above were derived from the affidavits of former DEA drug informant Ramon Rodriguez, dated April 21, 1992 and June 1, 1992, which were published in the Congressional Record on November 9, 1993. The documentary source for the third passage listed above was the affidavit of Molinari Chief Investigator Ray Hagemann, which was published in the Congressional Record on November 21, 1993. The fourth passage was derived from, *inter alia*: (1) affidavits of investigator Hector Rodriguez dated February 11, 1992 and June 10, 1992, which were published in the Congressional Record on February 8, 1994 and November 10, 1993, respectively, and (2) the affidavit of Molinari investigator Luis Rodriguez dated January 14, 1992, which was printed in the Congressional Record on March 17, 1994. Another affidavit by Hector Rodriguez, dated January 24, 1992, is offered by defendants as an additional factual basis for the contents of the fourth complained-of passage from the book, although this last affida-

vit concededly was never published in the Congressional Record.

The motion court, in denying defendants' dismissal motion, implicitly rejected their contention that the absolute privilege of Civil Rights Law § 74 applied to the challenged statements. I conclude, for the reasons that follow, that the statute is indeed inapplicable to the book's challenged statements.

Section 74 provides that any "fair and true" report of a judicial, legislative, or "other official proceeding" is absolutely privileged from a claim of defamation (*see, Daniel Goldreyer, Ltd. v Van de Wetering*, 217 AD2d 434, 435). Where the report concerns a criminal prosecution or civil lawsuit, there is normally little doubt that the report is covered by section 74 (*see, e.g., Branca v Mayesh*, 101 AD2d 872, 873, *affd* 63 NY2d 994, citing *Campbell v New York Evening Post*, 245 NY 320). The same holds true where governmental administrative agencies hold "quasi-judicial" hearings as prescribed by State regulations (*see, e.g., Stilsing Elec. v Joyce*, 113 AD2d 353). Nor can there be any doubt that an accurate report of a legislative debate is privileged under the statute. However, the conduct at issue here was an investigation privately initiated by a Borough President. This was neither a legislative proceeding nor a judicial or quasi-judicial proceeding, nor may it be viewed as some other kind of official proceeding as contemplated by the statute.

In the context of the privilege afforded by Civil Rights Law § 74, this Court has construed the term "official proceeding" so as to apply the privilege "as long as it concerns activities which are within the prescribed duties of a public body. The test is whether the report concerns 'action taken by a person officially empowered to do so'" (*Freeze Right Refrig. & Air Conditioning Servs. v City of New York*, 101 AD2d 175, 182). Pursuant to this standard, an investigation by the New York City Department of Consumer Affairs was held to be an official proceeding, and newspaper accounts of the Department's reports and findings following its investigation are privileged (*id.*). Similarly, when a town supervisor, at a town meeting, explains his reasons for firing the town's youth bureau director, such public statements are within the prescribed duties of the town supervisor and therefore constitute official proceedings, and news accounts of these statements must be privileged (*see, Cosme v Town of Islip*, 102 AD2d 717, *affd* 63 NY2d 908). The privilege for "official proceeding[s]" has even been accorded to a report issued after investigation and hearings by the Dutch Ministry of Justice (*see, Daniel Goldreyer, Ltd. v Van de Wetering*, 217 AD2d 434, *supra*).

However, the foregoing cases concerned conduct of public bodies that were established and authorized to perform such work and issue such statements or reports. Nothing in the New York City Charter gives a Borough President the authority to conduct an investigation geared toward seeking to reopen the criminal prosecution of a convicted Federal agent (see, NY City Charter § 82).

While Molinari arranged for the investigation in his capacity as an elected official, rather than as a private individual, and the investigation was paid for out of Molinari's office budget, defendants' reliance upon these acts is misplaced. The fact that an elected official takes some particular action does not alone render that conduct "official proceeding[s]". Molinari's actions bear some resemblance to the case of Nunnally v Press Publ. Co. (110 App Div 10, 12-13 [1905]), in which the Court concluded that although an investigation was "conducted by persons connected with the coroner's office and by members of a municipal police force," it did not constitute the type of official proceedings as contemplated by the predecessor statute, section 1907 of the Code of Civil Procedure. Municipal employees may act in their official capacity, and yet, even when their work is part of their official job description, it may not fall within the parameters of the term "official proceeding" as contemplated in the statute (see, Kelley v Hearst Corp., 2 AD2d 480, 484, amended on other grounds 3 AD2d 610 [applying former Civ Prac Act § 337]).

Nor does the subsequent publication in the Congressional Record of the resulting affidavits transform Molinari's investigation into a "legislative proceeding," or any other type of official proceeding. Where, as here, materials are published in the "Extensions of Remarks" section of the Congressional Record, by definition those materials were "not germane to the proceedings" (Rules of House of Representatives, rule XXXIV, at 789). While members of Congress are permitted the indulgence of including in the Congressional Record a limited quantity of materials unrelated to the business undertaken in Congress that day, the only "proceeding" undertaken regarding the affidavits in question was the very process of submitting them for inclusion in the Record.

The motion court was correct in holding that the rule to apply in this case is that one who publishes a written work "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition" regarding a private individual, may be found liable for defamation only if it is determined that he acted with gross irrespon

sibility (*Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199; *Gaeta v New York News*, 62 NY2d 340, 345). However, the motion court erred in denying dismissal pursuant to that standard, inasmuch as defendants' documentary evidence successfully demonstrated, incontrovertibly, that they had not acted with gross irresponsibility.

The documentary evidence submitted by defendants establishes, as a matter of law, that the assertions made about plaintiff in the book were accurate reports of the substance of the evidence obtained by the Molinari investigation. While the mere existence of these affidavits does not make their assertions true, defendants' book does not say that the accusations contained in the affidavits were true or proven. Rather, the book merely reports, accurately, on the impetus for, the process of, and the evidence obtained by the Molinari investigation.

Indeed, immediately after the book sets out the assertions made by former DEA informant Ramon Rodriguez, it goes so far as to inform the reader that the Department of Justice rejected any information coming from Ramon Rodriguez, having determined that Rodriguez was not a credible witness. It even explained that Rodriguez had been dismissed as a DEA informant at the insistence of a Federal prosecutor because he changed his story about the circumstances of a major drug deal.

I reject the view of the motion court that in order to successfully defend against a claim of defamation, authors and publishers must demonstrate that they independently ascertained the veracity of their source materials, even when the book actually discloses the source of the information it imparts. The court's reliance upon *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, *supra*) for this proposition is misplaced, since in that case, the published article did not establish how—or why—the information therein was obtained.

In *Chapadeau*, while the challenged newspaper article accurately reported that the plaintiff had been arrested for possession of heroin and a hypodermic needle, it then went on to incorrectly report that he had been arrested in conjunction with two other arrested men, and that all three were arrested at a party at which both beer and drugs were found. The Court held that this error was insufficient to establish that the defendant had acted in a grossly irresponsible manner (*id.*, at 200). The evidence that the reporter had consulted with the town police captain and had examined the police record was relied upon to demonstrate that the reporter had proceeded responsi-

bly, notwithstanding her inclusion of erroneous information (*id.*).

In the subsequent case of *Gaeta v New York News* (62 NY2d 340, *supra*), defamation claims were dismissed although the challenged newspaper reports made false statements about the plaintiff in the course of articles on matters of public concern. In *Gaeta*, the subject newspaper article, in discussing the transfer of mentally ill patients out of psychiatric hospitals, focused on one particular individual, and stated—as fact—that the individuals's nervous breakdown " 'was precipitated by a messy divorce and the fact that his son killed himself because his mother dated other men' " (*id.*, at 346). The former wife of this individual then sued, asserting that her divorce from her former husband was not messy, but on consent, that the divorce had not precipitated her former husband's breakdown, that she had not dated other men, and that their son's death was not suicide. The Court dismissed her defamation claims notwithstanding the asserted factual errors, holding that the reporter's showing that she had relied upon information obtained from the man's sister was sufficient: "[t]here was no reason to doubt the veracity of the information * * * and indeed good reason to believe it was accurate" (*id.*, at 351).

While both cases emphasize that the defendants made a degree of inquiry before publishing the challenged information, they should not be read to require the type of inquiry that plaintiff here suggests is necessary. In *Chapadeau*, it was enough that the reporter consulted with a police captain and examined the police record before publishing the (somewhat incorrect) article. It *Gaeta*, it was sufficient that "sources in the office of [the] Nursing Homes Special Prosecutor" told the reporter that the sister of the individual being discussed was a reliable source (62 NY2d, *supra*, at 347). The writer had no obligation to investigate further into the accuracy of the source's information.

One need only read the section of "Wild Cowboys" containing the statements challenged in this case, and compare them with the source materials submitted by defendants, to conclude that a far greater degree of care was taken in obtaining the information imparted in "Wild Cowboys" than was taken in writing the articles challenged in *Chapadeau* and *Gaeta*. Such review and comparison conclusively demonstrates that the portion of the book at issue was not published irresponsibly, but rather, with "due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*Chapadeau v Utica Observer-Dispatch*, *supra*, at 199).

As the Court remarked in *Holy Spirit Assn. v New York Times Co.* (49 NY2d 63, 67-68), in concluding that the newspaper articles challenged there were "fair and true" accounts of intelligence reports released by the House Subcommittee on International Relations investigating Korean-American affairs: "the newspaper articles here at issue neither assigned to the intelligence reports allegations not contained in those documents, nor added, by virtue of word usage or otherwise, greater credence to those documents than was appropriate considering their nature." Similarly, in the matter at hand, the book's challenged statements contained no assertion that was not in the source materials, nor did they add greater credence to the affidavits than was appropriate. Being "fair and accurate" reports of an investigation and the evidence it obtained, the challenged statements cannot logically be termed "grossly irresponsible" reporting.

In a typical situation, where the challenged publication does not include a complete explanation of the source of the reported information, a plaintiff may well be entitled to proceed with discovery before the court can determine the issue of gross irresponsibility. However, here there is no reason to require defendants to submit to discovery before determination of the issue on the merits. The book and the documents it relied upon provide the full picture of how the writer came by the information, and the documents speak for themselves.

Finally, in any event, the IAS Court erred by sustaining the claim for punitive damages. Punitive damages are intended " 'to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights' " (*Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479-480). Mere negligent reliance upon a source, or a failure to conduct further investigation, does not suffice (*see, Suozzi v Parente*, 202 AD2d 94, 101-102, *lv dismissed and denied* 85 NY2d 923). At best, a failure to conduct further, independent investigation is what has been established here; nothing in plaintiff's showing demonstrates the type of recklessness or disregard that would warrant punitive damages. The case upon which the IAS Court relied on this point is not to the contrary (*see, Westmoreland v CBS Inc.*, 596 F Supp 1170).

For the foregoing reasons, I concur with the majority's dismissal of the complaint.