PAUL R. NIKA, Plaintiff-Appellant, v. WARREN E. DANZ, Defendant-Appellee.

Fourth District No. 4—89—0547

Opinion filed June 28, 1990.

Wayne R. Golomb, of Springfield, for appellant.

Robert E. Gillespie, Deborah L. Rose, William P. Hardy, and Matthew J. Maddox, all of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Springfield, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:
Plaintiff, Paul Nika, filed a legal malpractice action against defendant, attorney Warren Danz, alleging Danz was negligent when

he failed to file a personal injury action against U.S. Printing Ink (U.S. Ink), the party allegedly responsible for plaintiff's back injuries. Plaintiff appeals from the jury verdict for Danz and raises the following issues for our consideration: (1) whether the trial court violated Supreme Court Rule 239 by giving non-Illinois Pattern Jury Instructions (IPI) instructions where IPI instructions were tendered and applied to the case (107 Ill. 2d R. 239); (2) whether the trial court erred in allowing evidence of a fee dispute between plaintiff and Danz and evidence of plaintiff's receipt of a workers' compensation award to be presented to the jury; (3) whether the trial court erred in allowing defendant to cross-examine the plaintiff on the issue of the solvency of U.S. Ink; and (4) whether the trial court erred in allowing defendant's experts to testify regarding plaintiff's contributory negligence in the underlying action involving U.S. Ink and regarding the duty of plaintiff's employer to provide a safe workplace. We affirm.

Plaintiff testified that in 1979 he was employed as a truck driver for the State Journal Register (Register) in Springfield. His duties as a truck driver involved delivering newspapers out of town and, at the time of the accident, performing odd jobs. Plaintiff stated that on November 1, 1979, he went to the Register's Ninth Street facility in Springfield to pick up a barrel of ink. Plaintiff testified U.S. Ink was delivering ink at the Ninth Street facility on that day, and he saw the ink truck when he arrived at the loading dock to pick up the barrel. Plaintiff testified the black ink used in printing newspapers is delivered by hose from a tanker truck to an ink spout inside the Register building near the loading dock. Plaintiff testified that prior to the day of his accident, if the ink company spilled any ink, the ink company would clean it up with rubber gloves and rags. Plaintiff stated he was on the other side of the loading dock picking up some bundles of newspapers while the ink truck was delivering ink.

After the ink truck left, plaintiff stated he moved his panel truck over to the area where the ink truck was parked. Plaintiff backed his truck up to within 20 inches of the edge of the loading dock, and stepped out of the truck onto the loading dock. The barrel was located in the center of a floating dock which was five to six feet above the surface of the loading dock. Plaintiff stated that because the bed of the truck was six inches below the surface of the floating dock, when moved, the barrel would drop into the truck as it came off the floating dock.

Plaintiff described the barrel as a 55-gallon drum that was bolted closed. Plaintiff stated he grasped the top of the barrel with one hand and began sliding the barrel toward the truck with the other hand

when his feet slipped out from under him and he fell backward on the loading dock, with the barrel falling on top of him. Plaintiff stated he slipped on a piece of cardboard which had been put down on the loading dock to cover an ink spill. Plaintiff stated he did not look down at the loading dock as he stepped off his truck and, therefore, did not notice the cardboard. Plaintiff stated he reported the accident to his supervisor, Tony Denk. The rim of the barrel landed on plaintiff's groin. Plaintiff stated he had loaded ink barrels in the same manner before November 1, 1979. Plaintiff stated he finished his job on November 1, but experienced headaches, backaches, a stiff neck, and urinary problems. Plaintiff testified he continued to have urinary problems after seeing several doctors, had trouble concentrating and suffered from bad headaches.

On cross-examination, plaintiff was impeached with his prior testimony given in two depositions taken in 1985 for this case. In the depositions, plaintiff stated the loading dock was 5½ feet off the ground; the barrel was sitting in the middle of the floating dock, protruding one-half inch over the north edge; the top of the barrel was higher than the top of the truck; and the weight of the barrel was about 300 pounds. Plaintiff admitted that if he looked down, he would have seen the cardboard on the loading dock. Plaintiff also stated that he was aware of prior spills of ink. Plaintiff stated he did not see anyone near the ink truck on November 1, 1979, including janitorial staff for the Register.

Anton Denk was plaintiff's supervisor at the Register. Denk testified that after plaintiff told him about the accident on November 1, he observed two pieces of cardboard over an ink spill on the loading dock. Denk also testified that ink spills often occur after an ink delivery and the ink company is responsible for cleaning up the spill or for getting someone else to clean it up. Denk recalled a previous ink spill where U.S. Ink paid the Register's janitors to clean up the spill. Denk stated that since the accident, plaintiff had become forgetful on the job, wore a back brace, began turning down overtime, and suffered from urinary problems. Denk stated printing ink is as thick as molasses and oily.

On cross-examination, Denk admitted he had not observed very many deliveries of ink. Denk also stated that ink trucks do not have the equipment to clean up an ink spill. Denk stated that it is Register policy that employees get help when loading heavy objects. He also stated that the lighting on the loading dock allowed drivers to see any ink spills on the dock. Denk stated he did not know who put the cardboard on the ink spill on November 1, 1979, and he did not know any-

thing about a contract between the Register and U.S. Ink for cleaning up ink spills. On redirect, Denk stated he had seen U.S. Ink drivers clean up spills in the past.

Norman Antonacci, a janitor for the Register, testified for plaintiff that there are frequent spills of ink and he recalled a spill in the past when U.S. Ink paid Register employees directly to clean up a spill. Antonacci stated that if a truck driver did not clean up the ink, it was his responsibility to clean it up.

Dr. Clem Gotway, an internist and plaintiff's family physician since 1962, testified he treated plaintiff for his November 1979 injury. Gotway testified he referred plaintiff to Dr. Schroeder for physical therapy and to Dr. Trautmann for the urinary problems. Trautmann diagnosed plaintiff's urinary problem as prostatic urethritis. Gotway testified plaintiff was hospitalized in 1980 under the care of Dr. McVary, who was unable to give a firm diagnosis for plaintiff's urinary problem. Gotway testified plaintiff saw Drs. Good and Couch, both neurologists, for the headaches and seizures plaintiff was experiencing. Dr. Couch could not determine the cause of plaintiff's seizures and prescribed Dilantin. Gotway further testified plaintiff saw Dr. Taylor for chest pain and Drs. Madison, Rozhart and Texter for the urinary problems. When asked whether the November 1979 accident could have caused plaintiff's physical problems, Gotway stated he could only say that plaintiff did not have any of the physical problems before the accident in November 1979.

On cross-examination, Gotway was impeached with his own medical records for plaintiff, which indicated that in 1978, plaintiff complained of dizziness and urinary problems, in 1977 of back pain, and in October 1979 of chest pain. Gotway admitted there was no medical evidence linking any of plaintiff's physical problems with the November 1979 accident. Gotway testified that a diagnosis of plaintiff's problems was complicated by the nature of the problems and the number of work-related accidents plaintiff had between 1979 and 1985. Gotway stated that since the source of the problem could not be found and the date of the onset of the symptoms was November 1979, he concluded the November 1979 accident caused plaintiff's physical problems.

Dr. Victor Trautmann testified he examined the plaintiff on January 13, 1980. At that time, Trautmann determined plaintiff's incontinent problems were caused by nervousness. Trautmann testified after plaintiff was treated with Valium, his condition improved. Trautmann testified he saw plaintiff every three months until August 1980, when plaintiff reported he was much improved. Trautmann expressed no

opinion as to whether plaintiff's accident in November 1979 caused the urinary problems and stated his opinion was consistent with that given by Dr. McVary.

Plaintiff testified he contacted Danz in August 1980 after he saw Danz's name posted in the union hall. Plaintiff testified he told Danz at their first meeting about the ink spill and that he wanted Danz to represent him and file an action against U.S. Ink. Plaintiff testified that U.S. Ink was a "big money maker" company because it had been hauling ink for as long as plaintiff had worked for the Register. Plaintiff stated he was not concerned about workers' compensation because the Register was not responsible for the spill. Plaintiff stated Danz told him he would "handle it." Plaintiff admitted he received letters from Danz which referred to the Industrial Commission. Plaintiff testified he told Danz more than once his main concern was U.S. Ink and not the workers' compensation case. Plaintiff stated that after he had some discussions with friends who suggested that the statute of limitations on an action against U.S. Ink had run, he called the Attorney General's office in Springfield and found out the limitations period for the claim against U.S. Ink had passed.

On cross-examination, plaintiff admitted he was a union steward at the time he hired Danz. Plaintiff testified he did not know about the workers' compensation system and he filed the claim because it was company policy and not because he wanted to collect from the Register. Plaintiff denied receiving a letter from Danz dated August 18, 1980, but was impeached with his prior deposition testimony when he said that he understood the August 1980 letter to be a contract with Danz. Plaintiff was shown the letters Danz sent to him regarding the workers' compensation case, but testified he did not recall receiving some of the letters. When asked about the letters at trial, plaintiff stated he thought the letters concerned his case against U.S. Ink. Most of the letters from Danz referenced the matter he was handling for plaintiff as "Re: Nika v. Journal Register."

Plaintiff testified on cross-examination he did not discuss any settlement of the workers' compensation case with Danz. Plaintiff testified he settled the workers' compensation case when attorney Golomb represented him and the settlement concerned only his 1979 accident. A copy of the settlement contract which plaintiff signed was admitted into evidence, without objection. The settlement included four accident dates and five file numbers for the workers' compensation cases plaintiff filed between 1979 and 1982.

Plaintiff stated that at the time of the settlement, he got into a fee dispute with Danz. When questioned about the references in the letters

from Danz to plaintiff to "Industrial Commission" and "workers' compensation," plaintiff stated he did not connect these terms with the type of action Danz was handling on his behalf. Plaintiff further stated he did not recall signing a contract with Danz and he never asked Danz in writing about the claim against U.S. Ink.

On redirect, plaintiff stated he called Danz's office several times to inquire about his case but his phone calls were not returned. Plaintiff also stated that when he met with Danz in Springfield, he would ask about his case against U.S. Ink but Danz only avoided the question. Plaintiff stated that Danz collected $1,300 in legal fees from him.

On further cross-examination, plaintiff stated U.S. Ink was a "wealthy company" because it has a lot of tanker trucks. Plaintiff admitted he had never seen a financial statement for U.S. Ink and did not know whether it had ever filed for bankruptcy. When asked again how he knew U.S. Ink was solvent, plaintiff stated, "I've seen their trucks and that's enough right there."

Danz testified his law practice is primarily confined to workers' compensation cases. Danz stated plaintiff first contacted him in February 1980. Danz immediately sent plaintiff a letter and set up a meeting in Springfield, which plaintiff did not attend. Danz stated plaintiff finally met with him on August 12, 1980, in Springfield and they met monthly until Danz was discharged by plaintiff in 1982. Danz stated plaintiff was concerned about an action against the Register for workers' compensation benefits and never mentioned a personal injury action or U.S. Ink. Danz testified that even if plaintiff had told him about the ink company, it would not have changed anything because plaintiff's actions caused his injuries. Danz stated plaintiff knew Danz was handling a workers' compensation case for him.

Danz met with plaintiff on July 13, 1981, to discuss a $6,000 settlement offer, but plaintiff wanted no less than $25,000. According to Danz, the difficulty with plaintiff's case was that the doctors could not tie plaintiff's urinary problems to the November 1979 accident. Danz reported that plaintiff was angry and wanted to see other doctors. Danz sent plaintiff to Drs. Rivero and Schultz. Danz stated that if plaintiff had asked him to file a personal injury action, he would have asked more questions about the accident and used a different form letter with the fee language for a personal injury case. Since plaintiff's case related only to workers' compensation, the letter sent to plaintiff after the first meeting included language for the statutory legal fee for a workers' compensation case.

Danz stated his office file for plaintiff's case indicated he was handling a workers' compensation case. Danz also stated he would not ac-

cept a personal injury case like plaintiff's because there was no value to it. Danz stated that when plaintiff became upset that his medical bills were not being paid, he suggested the bills be submitted to the Register's group insurance carrier and reimbursement could be obtained after the workers' compensation case was concluded. Danz stated plaintiff did not want to submit his bills to group insurance. Danz scheduled the trial for plaintiff's workers' compensation claim in 1982. Before it started, Danz learned plaintiff had discharged him.

After attorney Golomb began representing the plaintiff, Danz contacted Golomb in order to get reimbursed for his costs in getting medical reports. Danz testified that Golomb refused to pay him anything for his two years of services for plaintiff and threatened to bring a malpractice action against him for not filing a suit for plaintiff against U.S. Ink if he continued to pursue his claim for fees. Danz stated that the first time he heard anything about U.S. Ink was when Golomb threatened to sue him. Danz stated hearings were eventually conducted before the Industrial Commission on the fee issue and he was awarded $1,000 in fees and $330 in costs.

On cross-examination, Danz stated the first time he learned that plaintiff was driving a van and slipped on ink on November 1, 1979, was on July 12, 1981, after he read notes taken by his law clerk at the time, Matthew Ryan, at Ryan's meeting with plaintiff in July 1981. Danz also admitted that his notes from the August 1980 meeting with plaintiff did not reflect anything about a piece of cardboard on the loading dock. Danz again stated that based on his August 1980 interview with plaintiff, he did not believe any viable common law action against a third party existed.

On redirect, Danz stated any reports from plaintiff's supervisor at the Register would not have changed his opinion of plaintiff's case. According to Danz, the fact that plaintiff slipped on ink was only one factor involved in plaintiff's contributory negligence. The other factor was that plaintiff attempted to move a 300-pound barrel without any assistance.

Gary Borah, attorney for the Register in the workers' compensation case, testified for plaintiff that he met with Danz and plaintiff regarding the accident. Borah stated it was impossible that plaintiff did not know Danz was handling a workers' compensation case for him. Borah stated he recommended that plaintiff submit his medical bills to the group insurance carrier for the Register because the doctors could not connect plaintiff's injuries to the November 1979 accident. Borah testified he recalled the fee dispute between Danz and plaintiff. He also stated he did not believe plaintiff had a viable action against U.S.

Ink and that Danz did not violate any legal standards in his representation of plaintiff.

On cross-examination, Borah stated that an attorney has a duty when representing an employer in a case involving a personal injury to an employee to investigate any possible actions against a third party who may have caused the injury, but there is no duty to investigate when representing an employee. Borah stated the identity of the person responsible for the ink spill on November 1, 1979, was one factor to consider in deciding whether plaintiff had a viable action against a third party. Borah stated that the fact that plaintiff knew ink was delivered on the day of his accident and knew of previous spills required that he exercise a greater standard of care in moving the ink barrel. On redirect, Borah stated that even assuming U.S. Ink spilled the ink and placed the cardboard on the spill, plaintiff's negligence was so overwhelming that it operated as a complete bar to any third-party action against U.S. Ink.

Attorney Matthew Ryan testified for Danz. Ryan worked for Danz in the summer of 1981 and stated there was no question that Danz was handling a workers' compensation case for plaintiff. Ryan interviewed plaintiff once in 1981 and stated his notes from the interview did not indicate anything about ink being spilled by U.S. Ink. Ryan stated Danz's office file for plaintiff's case did not include any information about the ink company.

Attorney William McNutt, a general practice attorney, testified as an expert for plaintiff. McNutt stated he based his opinion on plaintiff's deposition and in-court testimony. McNutt stated Danz had an obligation to investigate the facts of the case, tell plaintiff whether a common law action existed and whether he would file it or that plaintiff should hire someone else to file the action. McNutt testified there was a viable action against U.S. Ink and Danz should have investigated the case by looking at the accident reports filed by plaintiff's supervisor. McNutt stated Danz should have found out who was responsible for cleaning up the ink spill. McNutt also stated that Danz's file notes indicated he knew all the facts about plaintiff's accident. McNutt stated that plaintiff was not negligent in the way he moved the barrel. According to McNutt, Danz was negligent in not filing an action for plaintiff and in not telling plaintiff he was not going to file suit against U.S. Ink. McNutt estimated plaintiff's damages to be $300,000 to $500,000.

On cross-examination, McNutt stated that when a person hires an attorney to handle a workers' compensation case, the attorney cannot file a personal injury action for the client unless instructed to do so.

McNutt stated that based on plaintiff's deposition testimony, he did not believe plaintiff was negligent in moving the barrel, although he also stated he was aware that plaintiff could have asked for assistance in moving the barrel. McNutt admitted that the letter confirming the first meeting between Danz and plaintiff referred only to workers' compensation and there was nothing in Danz's file to indicate he was hired to file a common law action for plaintiff. McNutt stated that an attorney would be stupid not to file a common law action if he knew about one because there is more money in these actions.

McNutt admitted that in evaluating a personal injury action, a lawyer considers the cost to the client, evidence of the client's contributory negligence, and the value of the workers' compensation lien. Where a person's injuries cannot be connected to an accident, the case has less value. McNutt also admitted that in an unrelated personal injury case, he had valued the case at $100,000, the client had valued it at $250,000, and the jury did not award any damages. On further cross-examination, McNutt stated he was not aware that prior to the 1979 accident, plaintiff had complained of headaches and vertigo.

Charles Gramlich testified as an expert for Danz. Gramlich testified he was familiar with the practice of personal injury and workers' compensation lawyers, and stated he did not believe Danz violated any duty in his representation of plaintiff or committed legal malpractice. Gramlich stated plaintiff's action in moving the barrel amounted to contributory negligence which would bar an action against the ink company for the spill. Gramlich stated any action that would have been filed against U.S. Ink would have been worthless, and any further investigation by Danz after taking the workers' compensation case would have been futile. Gramlich testified he reviewed Danz's office file on plaintiff's case and it did not have any information about U.S. Ink being responsible for the spill. Gramlich stated that if Danz had any information that there was a possible common law action against U.S. Ink, Danz had more motive to file than not to file, because there is more money in common law cases than in workers' compensation cases. In reference to the problems tying plaintiff's injuries to the accident on November 1, 1979, Gramlich stated plaintiff's case had been characterized by a doctor as "greenback neurosis," or compensation neurosis. This term refers to the situation where an injured person has physical problems up until the time a settlement is received, after which the physical problems disappear. Gramlich noted that it would be impossible for someone like the plaintiff to not be aware that he was at a workers' compensation hearing, as opposed to a regular court hearing, given that plaintiff was a union steward and union stewards are

aware of employee rights and the workers' compensation system.

On cross-examination, Gramlich admitted that if an attorney was hired by a client to file a common law action, the attorney should investigate the claim and advise the client as to whether a suit should be filed. Gramlich stated the investigation in this case would have entailed contacting the Register to get details about the accident. Gramlich stated it is negligence not to advise a client of the decision as to whether to file a personal injury action.

The jury was given instructions for the underlying case, which were labeled *"Nika v. U.S. Printing Ink Company"* (hypothetical), and separate instructions for the legal malpractice action, labeled *"Nika v. Danz."* The jury was further instructed to consider the malpractice action first and only if there was a finding of liability on the part of Danz was the jury to consider the underlying case. Several general instructions pertaining to both cases were labeled with both names. On May 9, 1989, the jury returned a general verdict for Danz.

Plaintiff first argues the two separate sets of instructions given in this case, presented to the jury as "a case within a case," violated Supreme Court Rule 239 and produced excessive instructions which were difficult to understand and follow. Plaintiff contends the instructions directing the jury to first consider defendant's liability to plaintiff were erroneous because the underlying case should have been considered first.

Defendant argues the trial court correctly presented the legal malpractice action to the jury. Defendant contends the sequence of the jury instructions properly presented the factual dispute between plaintiff and defendant: that is, that defendant had a duty to investigate any possible personal injury action (liability) and because he did not, plaintiff lost his right to recover against U.S. Ink (damages).

Supreme Court Rule 239(a) requires that whenever the IPI contains an instruction applicable to a civil case, that instruction should be used unless the court determines that it does not accurately state the law. (107 Ill. 2d R. 239(a).) Where non-IPI instructions are given, they should be "brief, impartial, and free from argument." (107 Ill. 2d R. 239(a).) On review, the given instructions should be considered as a whole to determine whether they fairly and fully stated the law applicable to the case. (*Zieger v. Manhattan Coffee Co.* (1983), 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855.) Only where it is determined that an instruction misled the jury, thereby prejudicing the losing party, should a reviewing court reverse the trial court. *King v. Casad* (1984), 122 Ill. App. 3d 566, 572, 461 N.E.2d 685, 689; *Both v. Nelson* (1964), 31 Ill. 2d 511, 202 N.E.2d 494.

██ █ A legal malpractice action is similar to an ordinary negligence action. The plaintiff-client must prove an attorney-client relationship existed; the duty owed to the plaintiff-client was breached; the attorney's negligence was the proximate cause of injury; and actual damages. (*Sexton v. Smith* (1986), 112 Ill. 2d 187, 492 N.E.2d 1284; *Albright v. Seyfarth, Fairweather, Shaw & Geraldson* (1988), 176 Ill. App. 3d 921, 926, 531 N.E.2d 948, 951; *Cook v. Gould* (1982), 109 Ill. App. 3d 311, 314, 440 N.E.2d 448, 450.) In order to succeed in a cause of action for legal malpractice, a plaintiff must prove that *but for* the negligence charged, he would have been successful in the prosecution or defense of a cause of action involving a third party. (*Albright*, 176 Ill. App. 3d at 926, 531 N.E.2d at 951; D. Horan & G. Spellmire, Attorney Malpractice: Prevention and Defense, §19.01, at 19—2 (1986).) Thus, even if an attorney was negligent in not filing an action within the statute of limitations, if the client cannot establish that his case would have been meritorious, no damages are shown and no recovery can be had. *Cook*, 109 Ill. App. 3d at 314, 440 N.E.2d at 450.

██ Where, as here, an attorney is charged with negligently not filing an action within the statute of limitations, the plaintiff must re-create and litigate the action which was never filed. The accepted procedure for presenting evidence regarding the underlying action in a legal malpractice action is known as a "suit within a suit," or "trial-within-a-trial." (2 R. Mallen & J. Smith, Legal Malpractice §27.7, at 641 (3d ed. 1989).) The objective is to establish what the result *should have been*, had the case been filed. 2 R. Mallen & J. Smith, Legal Malpractice §27.7, at 641-42 (3d ed. 1989).

Before considering plaintiff's issue on the jury instructions, a matter involving the preservation of issues for review is apparent in the record. The common law record includes a set of instructions not marked, with one exception, with an IPI number, plaintiff's number or defendant's number. Further, some of these instructions are marked "given"; some are not. In a supplement to the record, plaintiff submitted the set of jury instructions he allegedly submitted to the trial judge. These are not marked as required by the supreme court rules and were not certified as part of the proceedings in this cause below. It is apparent from the transcript involving the jury instruction conference on May 9, 1989, that plaintiff's instructions were rejected *prior* to May 9 and plaintiff submitted instructions at the instruction conference to preserve the issue for review. At oral argument, plaintiff requested leave to further supplement the record with a set of jury instructions. Later, plaintiff presented a written motion to supplement the record with an additional set of instructions. We address the state

of the record and plaintiff's motion in turn.

In their briefs and at oral arguments, the parties repeatedly referred to "defendant's instruction No. ____," but do not tie them to the instructions in the record. It is apparent plaintiff's latest supplement to record consists of his attorney's file copies of the instructions allegedly given and refused in this case. This supplement was not certified by the trial court.

Section 2—1107 of the Civil Practice Law states:

> "Instructing the Jury ***. (a) *** An original and one copy of each instruction asked by any party shall be tendered to the court. The copies shall be numbered and shall indicate who tendered them. Copies of instructions given on the court's own motion or modified by the court shall be so identified. When instructions are asked which the court refuses to give, the court shall on the margin of the original and copy write the word 'refused' and shall write the word 'given' on the margin of the original and copy of those given. ***
>
> (b) *** The originals and copies of all instructions, whether given, modified or refused, shall be filed as part of the proceedings in the cause." (Ill. Rev. Stat. 1987, ch. 110, pars. 2—1107(a), (b).)

Supreme Court Rule 239(c) states:

> "(c) Procedure. Each instruction shall be accompanied by a copy, and a copy shall be delivered to opposing counsel. In addition to numbering the copies and indicating who tendered them, as required by section 2—1107 *** the copy shall contain a notation substantially as follows:
>
> 'IPI No. ...' or 'IPI No. ... Modified' or 'Not in IPI' as the case may be. All objections made at the conference and the rulings thereon shall be shown in the report of proceedings." (107 Ill. 2d R. 239(c).)

Supreme Court Rule 323 states:

> "(a) Contents; Preparation. A report of proceedings may include evidence, oral rulings of the trial judge, a brief statement of the trial judge of the reasons for his decision, and any other proceedings that the Party submitting it desires to have incorporated in the record on appeal. The report of proceedings shall include all the evidence pertinent to the issues on appeal.
> ***
> (b) Certification and Filing. A report of proceedings shall be submitted, upon notice given by the party seeking certification, to the judge before whom the proceedings occurred *** for his

certificate of correctness, and shall be filed, duly certified, in the trial court within 49 days after the filing of the notice of appeal. If, however, the parties so stipulate, a report of proceedings may be filed without certification." (107 Ill. 2d Rules 323(a), (b).) Supreme Court Rule 329 states:

"If the record is insufficient to present fully and fairly the questions involved, the requisite portions may be supplied at the cost of the appellant. If necessary, a supplemental record may be certified and transmitted." 107 Ill. 2d R. 329.

■■ ■ Plaintiff is responsible for presenting a complete record of the trial proceedings in this case. Plaintiff has not presented a complete record and has not certified the supplements to record as required by Rules 323 and 329. In the absence of an adequate record on appeal, it is presumed that the judgment entered conformed to the law and was based on sufficient factual information. (*Chicago City Bank & Trust Co. v. Wilson* (1980), 86 Ill. App. 3d 452, 407 N.E.2d 964.) Where, as here, the issue involves instructions which are not properly marked "given" or "refused," or by number as required by the rules, the reviewing court need not consider any issues involving the instructions. (*People v. Chamberlain* (1972), 5 Ill. App. 3d 235, 282 N.E.2d 784 (under Supreme Court Rule 451 (see 50 Ill. 2d R. 451), virtually identical to Rule 239, which is applicable to criminal cases); *Kuhn v. General Parking Corp.* (1981), 98 Ill. App. 3d 570, 424 N.E.2d 941.) We find plaintiff has waived any consideration of the jury instructions due to the state of the record. Further, plaintiff's attempts to supplement the record do not cure the defects. Therefore, plaintiff's motion to supplement the record is denied.

■ On the merits, a review of the instructions in the record demonstrates the jury was given three sets of instructions; one for *"Nika v. Danz"*; one for *"Nika v. U.S. Printing Ink Company"* (hypothetical); and a third set to be used for both cases. The jury was instructed that only if it determined Danz was negligent was it to consider the net value of the underlying claim. Plaintiff asserts the underlying claim had to be considered first by the jury, before any consideration was given to Danz's alleged negligence in not filing an action against U.S. Ink. We disagree. This case is no different from an ordinary negligence action where the jury is instructed to consider a defendant's liability before considering any damages. In effect, the method of using three sets of instructions in this case separated the liability issue in the legal malpractice case from the damages issue. The instructions given, so far as can be determined, properly stated the legal framework applicable to this negligence case. We find no error.

Plaintiff next argues the trial court erred in instructing the jury that contributory negligence, not comparative negligence, rules applied to the underlying claim. Defendant argues the instructions were proper and supported by the evidence. Defendant contends that since plaintiff failed to present evidence that the underlying claim, if filed, would have gone to the jury after June 8, 1981, the date set in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, plaintiff has waived this issue. We find the jury was properly instructed, but do not agree with defendant's analysis.

In *Alvis*, comparative negligence, which allows parties to recover a proportion of damages not attributable to their own fault, was adopted in its pure form. Prior to *Alvis*, contributory negligence rules were in force and barred a plaintiff, only slightly negligent, from recovering any damages from a negligent defendant. The supreme court in *Alvis* directed that comparative negligence rules applied to cases where a trial commenced on or after June 8, 1981.

It is clear no trial of plaintiff's underlying claim began on this date. However, defendant's analysis is too simplistic in the context of this case. Initially, the focus must be on August 1980, when plaintiff first met with Danz. The evidence was disputed as to whether plaintiff told Danz, in August 1980, anything about U.S. Ink. The expert testimony on whether Danz had a duty in August 1980 to investigate a possible third-party action was also disputed. The next relevant time period is June and July 1981 when, according to Danz, he first discovered plaintiff slipped on ink *and* after the *Alvis* case was decided. Considering the change in contributory negligence rules and assuming Danz's discovery of new information in July 1981 regarding plaintiff's accident, any evidence regarding Danz's duty to reconsider his earlier judgment that no viable cause of action existed against U.S. Ink is relevant. If Danz did not have a duty to reevaluate his judgment, then the jury was properly instructed that pre-*Alvis* contributory negligence principles applied to the underlying claim.

We find plaintiff waived any consideration of this issue because he did not raise the issue of Danz's duty to reexamine plaintiff's potential claim after the *Alvis* decision in his case in chief. Defendant's objection to plaintiff's attempt to introduce this evidence through his cross-examination of defendant's expert was sustained for this very reason. Following the objection, plaintiff did not make an offer of proof. The waiver rule applies. *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.

Plaintiff next argues that even if the jury was properly instructed on contributory negligence, this defense is not available in a legal mal-

practice case. Specifically, plaintiff argues that because he did not know what information was necessary for a legally cognizable claim against U.S. Ink, he cannot be held responsible for his lack of knowledge. Further, plaintiff argues the duty to provide facts to Danz and whether plaintiff directed Danz to file an action against U.S. Ink amount to "all or nothing" defenses, which do not fit into a contributory negligence framework or qualify as affirmative defenses.

We find plaintiff's argument unpersuasive. As previously stated, legal malpractice cases are no different from an ordinary negligence case where contributory negligence is an affirmative defense (Ill. Rev. Stat. 1987, ch. 110, par. 2—613(d)). A client's negligence in a legal malpractice case can involve failure to provide essential information for his or her representation. Plaintiff's argument that this defense is "all or nothing" focuses only on the reason a client retains an attorney, and ignores a client's duty to provide an attorney with all the essential information.

Plaintiff next argues giving defendant's instruction No. 17 constituted plain error because the term "property" should have been "safety." As defendant correctly points out, this instruction was given for the malpractice case and refers to plaintiff's "property" as the potential cause of action against U.S. Ink. We find no merit in this claim of error.

Plaintiff also argues he was greatly prejudiced by the introduction at trial of evidence that plaintiff received an award for workers' compensation benefits. Plaintiff's motion in limine to preclude such testimony was denied. Plaintiff contends the collateral-source rule bars the introduction of such evidence and maintains defendant introduced this evidence to portray plaintiff as a "money-grabbing, venal person, claiming injuries and attempting to extract money out of everyone imaginable."

Defendant argues plaintiff's reliance on the collateral-source rule is misplaced in this case, because evidence that plaintiff received an award for workers' compensation benefits was relevant and introduced to establish whether plaintiff knew defendant was handling a workers' compensation case for him or a personal injury action against U.S. Ink. Defendant points out that where, as here, collateral-source evidence is used to impeach the credibility of the plaintiff, other jurisdictions have determined it is admissible. Defendant also notes that plaintiff opened the door to this evidence during his testimony; plaintiff opposed defendant's motion for separate trials of the malpractice claim case and the underlying claim, which would have prevented the introduction of evidence of the workers' compensation award in the trial of the

underlying claim; and plaintiff did not object to the testimony on collateral-source rule grounds at trial.

The record shows that during cross-examination of the plaintiff, evidence that plaintiff received a settlement in his workers' compensation case was brought out. A copy of the settlement contract plaintiff signed was admitted into evidence. The record also shows no objection was raised to this testimony or to the admission of the settlement contract.

We find plaintiff waived this issue for failure to object at trial. (*Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 458 N.E.2d 1331.) On the merits, the evidence regarding the workers' compensation award was presented to show that plaintiff knew all along that Danz was handling only a workers' compensation case, and not to show plaintiff had received compensation from a collateral source for his injuries. The main issue in this case was whether plaintiff knew Danz was handling a workers' compensation case and not a personal injury action. We do not believe the *amount* of the award should have been admitted to establish this point but, as stated, plaintiff offered no objection.

Plaintiff also argues the admission of evidence of a fee dispute between plaintiff and Danz allowed the jury to hear that plaintiff's motive for filing the action against Danz was bad, *i.e.*, that plaintiff filed the action because Danz was demanding fees. Plaintiff maintains the introduction of this evidence was improper and prejudicial.

Any prejudice from this evidence was created by the plaintiff. The record shows the issue of the fee dispute was raised by defendant in cross-examining the plaintiff without objection; on redirect of the plaintiff by attorney Golomb; on direct examination of Danz; during cross-examination of Danz by attorney Golomb; and during the direct examination by defendant of Gary Borah. Plaintiff objected to Borah's testimony on the fee dispute on the grounds that the court had previously prevented plaintiff from *continuing* his examination of Danz on the same issue. The court stated it would limit defendant's examination on this issue as well. No further testimony was received on this issue. Plaintiff did not ask that the testimony be stricken from the record. At no time did plaintiff raise any other objection to introduction of such evidence but in fact asked questions on the issue himself.

Plaintiff is correct that a party's bad motives in commencing an action are not a valid defense to the action and are immaterial. (*Somers v. AAA Temporary Services, Inc.* (1972), 5 Ill. App. 3d 931, 284 N.E.2d 462.) However, plaintiff can hardly claim error where his attorney conducted some lengthy examination of plaintiff and Danz on this

issue. We find plaintiff waived this issue. *Gibson v. State Farm Mutual Automobile Insurance Co.* (1984), 125 Ill. App. 3d 142, 465 N.E.2d 689.

Plaintiff claims the issue of the solvency of U.S. Ink further prejudiced plaintiff's case. It was determined before trial that as part of his *prima facie* case, plaintiff had to prove the solvency of U.S. Ink. The report of proceedings on this issue are not part of the record. Plaintiff's proof on the issue amounted to his testimony that U.S. Ink is a wealthy company, based on the number of trucks it owns. On cross-examination, plaintiff denied any knowledge of the actual financial condition of the company and no expert testimony was presented. The solvency issue was withdrawn from the case by the defendant at the instruction conference without objection from plaintiff. Plaintiff argues the only way to establish the solvency issue was through plaintiff's testimony.

We note plaintiff cites no authority on this issue and does not establish the prejudice suffered. The waiver rule applies. (*People ex rel. Daley v. Warren Motors, Inc.* (1986), 114 Ill. 2d 305, 500 N.E.2d 22.) On the merits, plaintiff could have presented evidence on this issue through the testimony of a third party, possibly an officer of the company. We note that the issue was not presented to the jury. No error.

Plaintiff argues the admission of expert testimony on an ultimate issue in the case, plaintiff's contributory negligence in moving the barrel, should not have been allowed and constituted plain error which deprived plaintiff of a fair trial. Plaintiff also argues evidence of the Register's duty to clean up the ink spill, presented through expert testimony, was improperly admitted.

Defendant first argues plaintiff waived these issues by failing to raise an objection at trial or ask that the testimony be stricken. Defendant also contends plaintiff raised the issue of the duty to clean up the spill in his examination of McNutt, Borah, and Gramlich. Alternatively, defendant argues plaintiff's statement of the law is erroneous. The rules of evidence allow experts to testify on the ultimate issue, and the testimony regarding plaintiff's contributory negligence in the underlying case, given by Gramlich and McNutt, was relevant to the standard of care against which Danz's conduct is measured.

The record shows plaintiff did not object to the testimony given by Gramlich, Borah, and McNutt on plaintiff's contributory negligence in moving the ink barrel. We find plaintiff has waived this issue because he did not object to the evidence. *Gibson*, 125 Ill. App. 3d 142, 465 N.E.2d 689.

Considering the merits, it is well established that an expert

may directly express his opinion on an ultimate issue. (*Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 237, 446 N.E.2d 570, 573.) However, not all opinions are admissible. The test is whether the expert's opinion on the ultimate issue will assist the trier of fact in understanding the evidence and for determining a fact in issue. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §704.1, at 479 (4th ed. 1984).

 █ In legal malpractice cases, expert testimony is generally used to establish the standard of care attorneys must exercise when representing clients. (2 R. Mallen & J. Smith, Legal Malpractice, §27.14, at 664 (3d ed. 1989).) It is also admissible to prove what the result should have been in the underlying proceeding. (2 R. Mallen & J. Smith, Legal Malpractice §27.16, at 679 (3d ed. 1989).) The expert testimony presented in this case on plaintiff's contributory negligence concerned the standard of care Danz was required to exercise in assessing the existence of a possible third-party action and whether he breached a duty to plaintiff. In substance, the expert testimony demonstrated that because the evidence so clearly showed plaintiff caused his own injuries, Danz was not negligent in not filing an action against U.S. Ink. The experts testified on the reasonableness of Danz's judgment that no viable cause of action against a third party existed. Moreover, the legal implications of plaintiff's contributory negligence in moving the ink barrel had to be presented through expert testimony because a jury would not be able to understand the issues. (*Schmidt v. Hinshaw, Culbertson, Moelmann, Hoban & Fuller* (1979), 75 Ill. App. 3d 516, 522, 394 N.E.2d 559, 563-64; 2 R. Mallen & J. Smith, Legal Malpractice §27.14, at 668-69 (3d ed. 1989).) We find the expert testimony was properly admitted.

As to the evidence regarding who had a duty to clean up the ink spill, plaintiff introduced testimony through his own cross-examination of Gramlich, Borah, and on direct examination of McNutt. Plaintiff can hardly claim error from his own actions at trial.

For the foregoing reasons, the order of the trial court is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.