**James CARMEL, Trustee for the Bankruptcy Estate of Emil Stavriotis and Judith Stavriotis, Plaintiffs–Appellants,**

v.

**CLAPP & EISENBERG, P.C., and Gerald Litwin, Defendants–Appellees.**

No. 89–1587.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1992.

Decided April 6, 1992.

See also 710 F.Supp. 216.

Arthur P. Sanderman, Ronald M. Brown, Brown & Shinitzky, Chicago, Ill., Daniel C. Meenan, Jr., George S. Feiwell, Michael J. Kralovec, Feiwell, Galper & Lasky, Chicago, Ill., for plaintiffs.

Ronald M. Wawrzyn (argued), Foley & Lardner, Milwaukee, Wis., George P. McAndrews, John J. Held, Jr., McAndrews, Held & Malloy, Chicago, Ill., for defendants-appellees.

Philip J. Nathanson (argued), Chicago, Ill., for appellant.

Before KANNE, Circuit Judge, WOOD, Jr., Senior Circuit Judge, and SHARP,* District Judge.

* The Honorable Allen Sharp, Chief Judge, United States District Court for the Northern District of Indiana, sitting by designation.

## I.

ALLEN SHARP, District Judge.

The complaint in this case was filed in the United States District Court for the Northern District of Illinois on the basis of diversity of citizenship, 28 U.S.C. § 1332, and the substantive law of New Jersey applies. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The appellants sought to recover damages alleged to be suffered as a result of the appellees' legal malpractice in the course of the representation of appellant Emil Stavriotis in regard to certain coal investment ventures during the years 1979 and 1980. The case went to trial before a jury between November 15 and December 7, 1988.

After deliberating for approximately eight hours, the jury answered special interrogatories under Rule 49 of the Federal Rules of Civil Procedure, in which it expressly found that the appellees had acted negligently and that their negligence proximately caused the damages to appellant Stavriotis. However, the jury made a determination under the N.J.S.A. 2A:15–5.1 *et seq.*, that 51% of the total negligence was attributable to appellant Emil Stavriotis and 49% was attributable to the appellees. Under the substantive law of New Jersey, a plaintiff is not entitled to recover if that plaintiff's negligence is found to cause more than 50% of the damages.[1] Judgment was therefore entered by the district court for the appellees on the jury verdict. The appellant filed a post-trial motion for judgment notwithstanding the verdict and for a new trial, which was denied by the district court. The appellant appeals *only* from the jury's verdict. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

There are three issues here presented. They are:

1. Whether substantial evidence exists to support the jury's verdict that the appellant was comparatively more negligent than the appellees.
2. Whether defense counsel's remark in closing argument constituted reversible error.
3. Whether a client's complicity in and knowledge of fraud in a transaction, which is not reported to his attorney, bars the client from recovery against the lawyer for negligence in the transaction.

## II.

The factual setting of this case demands a full and careful summary. This appellant, Emil Stavriotis, first retained the appellees, Gerald Litwin and the law firm in which he was a partner, namely Clapp & Eisenberg, in June of 1979, when Stavriotis was a resident of Tennessee and Litwin was a resident of New Jersey. There was no prior relationship between either Stavriotis, Litwin or C & E. Appellant was introduced to Litwin by a social friend and business associate, one Louis Santi. Appellant had traded in commodities for Santi and had worked on coal ventures with Santi before he approached Litwin.

Stavriotis had very considerable experience as a commodities trader, and traded in nearly 3,000 trades, many of which took the form of a sophisticated tax avoidance device called a "straddle." His initial trading for Santi involved a fund of $350,000, which was depleted within ten weeks. However, he was later successful in generating a profit for Santi.

While Stavriotis was a sophisticated commodities trader, he knew very little about the coal mining business. He was first introduced to coal mining by Santi in 1978, when Santi asked him to consider the task of raising money for his, Santi's, coal mining venture. In 1978, a year before Stavriotis had talked with Litwin for the first

---

1. **2A:15–5.1. Contributory negligence; elimination as bar to recovery; comparative negligence to determine damages.** Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought or was not greater than the combined negligence of the persons against whom recovery is sought. Any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering.

time, Santi attempted an educational process for Stavriotis in regard to the coal-mining business by putting him in touch with Henry Nelson. Stavriotis characterized this exposure to Nelson as "an incredibly useful exercise for my future efforts in understanding the coal industry." During these experiences between Stavriotis and Nelson in 1978, negative impressions of Nelson arose. Stavriotis learned that Nelson was unethical and was a man who had to be watched very carefully with respect to his conduct in coal properties in Kentucky. He discussed Nelson in a report which he prepared for Santi and was stunned when Santi showed apparent indifference to the fact that the report indicated that Nelson was both a "liar and/or potential thief." Nevertheless, Stavriotis decided to accept the assignment of raising money for Santi's coal ventures, but only on the condition that Nelson was excluded from management. Stavriotis knew, however, that Nelson would be instrumental in procuring coal mining property and in obtaining the leases to coal mining reserves from land owners that would be the basis for the coal ventures.

In this factual landscape, Stavriotis approached Litwin for the first time in 1979 for the purpose of securing professional legal services. Litwin was a specialist in taxation, and in mid-1979, Stavriotis approached Litwin to draft the private placement memoranda ("PPM") and other documents in connection with Santi's coal transactions. These syndications were to be sold to investors on the theory that the investors could deduct a substantial portion of their investment. The coal transaction documents were structured by Litwin with tax concepts in mind. The investor money was to be spent for coal development, which was deductible under 26 U.S.C. § 613 of the Internal Revenue Code. The IRS sent agents to the coal property and spent two years concluding its audit. This IRS audit scrutinized the subleases, contracts, and mining and development agreements drafted by Litwin, with a critical eye to determine whether or not the deductions were legitimate, ultimately allowing those deductions.

Litwin sent Stavriotis a draft of a coal PPM which notified Stavriotis of the speculative nature of the coal business and informed him that neither he nor the appellee law firm, Clapp & Eisenberg (C & E), would attempt to verify the accuracy of facts and representations in the PPM. After reviewing the initial coal offering, Stavriotis was concerned about the scope of his duties as general partner in the yet-to-be syndicated coal partnership. Litwin told him that he would have to hire professionals to assist him in his duty as a general partner, and Stavriotis retained a geologist in July of 1979 by the name of Russ Chittendon. Stavriotis told Chittenden that if any questions arose pertaining to his review of the geology reports, only he and/or Mr. Garten, a colleague of Santi, should be notified. Stavriotis also hired another geologist, a Mr. Conaway, to perform geology services. Conaway had been referred to Stavriotis by Santi's company, Minerals Development Company. Stavriotis was also using in common with his friend Santi, a local Memphis attorney, Roy Keathley, of whom Stavriotis had referred to as his "attorney for virtually all aspects of my business."

There was no written retainer agreement between Stavriotis and Litwin, nor was there a general retainer of Litwin by Stavriotis. Litwin testified that Stavriotis requested that he draft PPM in connection with his task of raising money for Santi's coal transactions. Litwin further testified that he understood Attorney Keathley was representing Santi and Stavriotis, both personally and in their general corporate matters. A total of five Stavriotis–Santi coal syndications were put together between December, 1979 and August, 1980. Stavriotis received in excess of $2 million in upfront commission in connection with these transactions and moved from Memphis, Tennessee to Palm Beach, Florida when the last coal deal was closed!

Stavriotis knew that Santi's colleague, Nelson, had engaged in unethical and illegal practices prior to the time that he met Litwin, yet he did *not* tell Litwin about Nelson's misdeeds until well after the syn-

dications had been completed and after he had received the $2 million in commission. In March of 1980, after two of the syndications had been completed, Stavriotis began getting more information about fraud and other wrongdoing in connection with the coal transactions. In March, 1980, Stavriotis met with Santi to discuss the progress of the two coal transactions that had closed and learned that Nelson had committed fraud in connection with the coal transaction by "lying, stealing and through the use of kickbacks." Stavriotis was understandably deeply concerned since he had learned from yet another Santi associate, Jerry Wells, that Santi was allowing certain amounts of money from the MDC budget "for Henry Nelson to steal." However, Stavriotis did nothing at this point to stop the yet-to-be syndications from going forward. He talked to Litwin about the progress of the prior four transactions and told Litwin that everything was going smoothly.

In 1984, shortly after Stavriotis had been sued by some of the coal investors, he wrote to Litwin: "At no time have I ever personally felt that you or your law firm were ever at fault...." *See* Transcript, p. 342, Appellees' Appendix p. 32. Rather, he believed that the blame was with Santi and his scheme to defraud not only the investors but him as well. He thereupon sought to have Santi criminally prosecuted.

During the trial of this case, Mr. James Brennan, a partner in the Securities Department at the Chicago-based law firm of Sidley & Austin, testified that C & E and Litwin did a very thorough and careful job complying with the securities law. Mr. Brennan also opined that Litwin did an outstanding job of disclosing to the investors what they were getting. Certainly, this evidence was at least admissible under Rule 704 of the Federal Rules of Evidence.

There is no evidence in this record to support any injury to Stavriotis based upon the alleged drafting errors in the subleases and the other contracts. The district judge precluded Stavriotis' damage expert from presenting evidence on most of his damage claims. The context in which this issue arose began with an objection by Mr. Wawrzyn, counsel for appellees:

MR. WAWRZYN: I don't want the jury inflamed by these million dollar numbers with no foundation. Nobody has ever let something this speculative go to the jury.

THE COURT: Well, it hasn't gone to the jury.

I will tell you, I am very seriously considering throwing the evidence of profitability out. The question now is whether I do it before he testifies or after.

The problem that we see here is that there is no record of profitability. There is a lack of experience and profitability record. There has not been an expert testify as to specifically the coal industry as to the profitability. There is no showing that these deals would have gone through had Mr. Litwin properly handled the legal. We even have another speculative matter, whether or not the titles could have ever gotten into a proper position whereby the deals could have even been closed had the proper legal care been exerted.

I am going to grant the motion and prohibit testimony as to profitability of the coal ventures as being too speculative.

MR. WAWRZYN: Thank you, Judge.

THE COURT: To my mind there is no showing at this time to show that the fact of damages or loss of profitability would have occurred had not the malpractice intervened.

For the various reasons that I have stated and specifically the additional reason that there has been no showing that had Mr. Litwin asserted the proper standards of conduct as an attorney, that the deals would have gone through or been aborted. I think it is just that we have piled too much speculation upon speculation to justify submitting this issue to the jury.

Transcript, pp. 1024–25. In the full evidentiary context of this case, this ruling was correct and is in no event reversible error. There is simply no evidence that any con-

duct by Litwin caused any damage to this appellant.

## III.

■ The appellant, Stavriotis, now brings this appeal alleging insufficient evidence in the record to support the jury's finding that he was comparatively more negligent than Litwin and that a remark made by Litwin's counsel in closing arguments had a prejudicial effect on the jury. Even where a district trial judge might seriously disagree with the way in which the jury chose to weigh the evidence, such is not enough to cause the verdict to be set aside. *See Foster v. Continental Can Corp.*, 101 F.R.D. 710 (N.D.Ind.1984), *aff'd*, 783 F.2d 731 (7th Cir.1986). The test in this circuit for reviewing a jury verdict on appeal is not whether it was against the weight of the evidence, but whether there is a reasonable basis in the record for the verdict. *See U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1369 (7th Cir.1985). If this test is met, we will not reweigh the evidence but will let the verdict stand. *Id.* In New Jersey, a jury's verdict is presumptively valid and "all reasonable intendments will be indulged in its support." *Bree v. Jalbert*, 87 N.J.Super. 452, 209 A.2d 836 (1965), *aff'd*, 91 N.J.Super. 38, 219 A.2d 178 (1966). These standards are substantially the same under both federal and New Jersey procedural law.

Stavriotis contends further that another aspect of Litwin's neglect was his failure to prepare a sublease or a mining agreement regarding the added lands that were to be transferred from Blue Gem I to Blue Gem II.

The appellees assert that although the issue of comparative negligence may involve a mixed question of law and fact, the gist of the appellant's appeal is solely evidentiary. The appellees' argument is that appellant attempts to frame his first issue as if to present this court with a review of the legal standard to be applied, when his only quarrel has to do with the facts of the case.

It is elementary in a negligence action that the plaintiff must establish the exist-ence of a duty owed to him by the defendant, a breach of that duty, evidence that the plaintiff was injured, and that defendant's breach of duty was a proximate cause of the plaintiff's injuries. *McIntosh v. Milano*, 168 N.J.Super. 466, 403 A.2d 500 (1979).

■ These basic concepts have been applied to legal malpractice actions. *See Nika v. Danz*, 199 Ill.App.3d 296, 556 N.E.2d 873, 145 Ill.Dec. 255 (4th Dist.1990). In a legal malpractice case, a plaintiff must prove that his/her injuries would not have occurred *but for* the defendant attorney's negligence. If the harm would have resulted irrespective of such negligence, then the negligence is not a substantial factor or cause-in-fact. *Lamb v. Barbour*, 188 N.J.Super. 6, 455 A.2d 1122 (1982), *cert. denied*, 93 N.J. 297, 460 A.2d 693 (1983).

■ Moreover, a client, even when proceeding *pro se*, has the burden of proof to show actual damages resulting from an attorney's alleged malpractice. *See Broad v. Conway*, 675 F.Supp. 768 (N.D.N.Y. 1987), *aff'd without op.*, 849 F.2d 1467 (2d Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 313, 102 L.Ed.2d 331 (1988).

■ Here, because of the highly speculative nature of the appellant's damage proof, the district court correctly disallowed a portion of the proffered testimony of his damage expert. No reversible error was committed by such inhibitive ruling.

It is also well established that a plaintiff client's failure to follow legal advice may constitute contributory negligence in a legal malpractice case. *See Theobald v. Byers*, 193 Cal.App.2d 147, 13 Cal.Rptr. 864, 866, 87 A.L.R.2d 986 (1st Dist.1961).

■ To establish proximate cause in legal malpractice cases, a plaintiff must demonstrate that his/her injuries would not have occurred but for the attorney's negligence. However, if the harm would have resulted irrespective of such negligence, then that negligence is not a substantial factor or a cause in fact. *See Lamb v. Barbour*, 455 A.2d at 1126, 188 N.J.Super. at 6. Here, as in *Lamb*, there is substantial evidence to suggest that *even* if Litwin

had been negligent in drafting the coal reserves subleases or exchange documents, the proximate cause of the appellant's losses was a combination of (1) the speculative nature of these transactions; (2) the fraud and failure of appellant and Nelson to secure the coal leases at all or properly to service royalty payments on these leases; (3) appellant's failure to intervene to stop Santi's and Nelson's fraud; (4) Santi's intention not to abide by the lease and exchange agreements; and (5) appellant's own failure to fulfill the side deal to the exchange which he concealed from Litwin.

More to the point, the appellant's own fraud may bar his legal malpractice claim in connection with transactions complained of. *See Goldstein v. Lustig,* 154 Ill.App.3d 595, 507 N.E.2d 164, 169–70, 107 Ill.Dec. 500, 505–06 (1st Dist.1987) (the court rejected a dentist's malpractice suit against his attorney where the client sought ways to preserve contractual rights to benefits from his employer that he forfeited by his admittedly fraudulent falsification of insurance claims). All of these are evidentiary considerations to be weighed by the jury under proper instructions. No one here questions the propriety of the instructions given to this jury.

## IV.

At the outset of the trial, the appellant filed a motion in limine regarding evidence of his losses as a commodity trader. Such was granted. During final argument, appellees' counsel argued:

> It may be what we have here—and I don't know this for a fact but there is circumstantial evidence to suggest it—it may be what we have is that Mr. Stavriotis lost millions of dollars in commodities trading and that he is attempting to get damages in this action for things Mr. Litwin doesn't have a thing to do with. On this record, where there is no evidence that he had any kind of syndications lined up, that is the only conclusion I can come to. We know he lost money somewhere. There is no evidence to support the fact that he lost the money due to anything that Mr. Litwin did. And there is evidence to support the fact that from the very beginning, as Ms. Nichols

said, until 1983, when she left, Mr. Stavriotis was trading commodities.

Transcript, p. 2038. No objection or motion was made then or later. The district judge was not asked by the appellant to take any corrective action whatsoever. These comments are generally in the category of things best left unsaid in final argument. *See United States v. Dominguez,* 835 F.2d 694, 700–01 (7th Cir.1987). However, the inaction of this appellant did not give the district judge a chance to deal affirmatively with this argument. *See Canada Dry Corp. v. Nehi Beverage Co.,* 723 F.2d 512, 513 (7th Cir.1983). Neither trial tactics, *Sadowski v. Bombardier Ltd.,* 539 F.2d 615 (7th Cir.1976), nor mere temerity, *Farmer v. Prast,* 721 F.2d 602 (7th Cir. 1983), will excuse counsel's failure to object to a remark made in closing argument.

In *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 238–239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940), the Supreme Court stated:

> ... Counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that comments to the jury were improper and prejudicial.

Under some circumstances, the objection/motion can be delayed until *immediately after* the close of arguments. *Joseph v. Brierton,* 739 F.2d 1244, 1249 (7th Cir.1984). Such was not done here.

Although unnecessary, this single isolated remark in final arguments at the end of a lengthy trial may well be within the ambit of harmless error. *Canada Dry,* 723 F.2d at 526–27, is fact specific on this issue. *See also Spray–Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1246 (7th Cir.1982), *aff'd,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). This closing argument comment does not provide a basis for reversal. The decision of the district court is affirmed. Costs on appeal assessed against the appellant.

AFFIRMED.