GOVERNMENTAL INTERINSURANCE EXCHANGE, on Its Behalf and as Subrogee of Kendall County, Illinois, *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. JAY S. JUDGE, Indiv., *et al.*, Defendants-Appellees and Cross-Appellants.

Fourth District    No. 4—04—0331

Argued December 14, 2004.—Opinion filed March 16, 2005.—Rehearing denied April 21, 2005.

COOK, P.J., dissenting.

Steven D. Pearson (argued), Peter Petrakis, and Omar S. Odland, all of Meckler, Bulger & Tilson, L.L.P., of Chicago, and Brian P. Thielen, of Thielen Law Offices, of Bloomington, for appellants.

Robert Marc Chemers and David S. Osborne (argued), both of Pretzel & Stouffer, Chtrd., of Chicago, for appellees Mary E. Dickson and Bond, Mork & Dickson, P.C.

Peter A. Monahan (argued) and Patricia M. Noonan, both of Alholm, Monahan, Klauke, Hay & Oldenburg, of Chicago, for other appellees.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Plaintiff Governmental Interinsurance Exchange (GIE) is an Illinois reciprocal insurance corporation with its principal place of business in Bloomington, McLean County, Illinois. Plaintiff Kendall County (County), Illinois, is an Illinois municipal entity. In November 1995, GIE retained defendant Mary E. Dickson to represent its insured, the County, in an auto accident case. In May 1996, GIE hired defendants Jay S. Judge (Judge) and Judge, James & Dutton, Ltd. (Judge firm), and in June 1997, GIE retained defendant Bond, Mork & Dickson, P.C. (Dickson firm), to represent the County.

In April 2001, plaintiffs filed this legal malpractice action against defendants, claiming defendants' failure to perfect the appeal caused

plaintiffs' loss of a meritorious appeal in the auto accident case. In March 2003, the trial court entered partial summary judgment for plaintiffs, finding defendants breached their duty to perfect the appeal.

In June 2003, defendants moved for partial summary judgment on the proximate cause issue, arguing that regardless of whether defendants had perfected the appeal, the appeal in the auto accident case would not have been successful. In so contending, defendants claimed the question of whether the appeal would have been successful was a question of law and should be decided by the trial court. In October 2003, the court ruled that the question of proximate cause in this appellate malpractice case is a question of law that should be decided by the court. In March 2004, the court granted defendants' partial summary judgment motion, finding plaintiffs' malpractice action lacked the proximate cause element. Plaintiffs appeal, arguing (1) the court erred in its ruling that the issue of proximate cause in appellate malpractice cases was a question of law; and (2) assuming that the proximate cause issue was a question of law, the court erred in its finding that the element of proximate cause was lacking in this case. We affirm.

## I. BACKGROUND

The case underlying this legal malpractice appeal arose out of an auto accident on Galena Road in the County. Galena Road is a two-lane road that runs generally east to west. In 1978, the County assumed the ownership of Galena Road from Little Rock Township. At that time, the County commissioned a preconstruction profile of the road and developed an improvement plan. The County then resurfaced the road and striped the center of the road with a skip-dash yellow line that permitted passing.

Expert testimony established that the Manual of Uniform Traffic Control Devices (MUTCD) provides guidelines on adequate sight distances. Under the MUTCD guideline, passing is only permissible where sight distances are adequate. If an engineering study has been performed and if sight distances are inadequate, a no-passing zone must be installed. In 1984, the MUTCD guideline lowered the minimal adequate sight distance. As a result of the reduction, the sight distance on Galena Road where the accident later occurred was inadequate. In 1993, the County resurfaced Galena Road and restriped the center of the road with the same skip-dashing yellow line that it had placed in 1978.

On the evening of November 1, 1994, Aaron Gesell was involved in a head-on collision with a car driven by Sandra Wittenmyer as he

was traveling eastbound on Galena Road. As a result of the collision, Sandra Wittenmyer suffered severe and permanent injuries. The collision occurred entirely in the westbound line as Gesell was passing another vehicle traveling in the eastbound line. The two cars collided at the apex of a rise in Galena Road. According to several witnesses, Gesell was traveling at a speed significantly higher than the posted 55-mile-per-hour speed limit. Gesell stated the reason that he passed the other vehicle in the westbound line was because he knew a skip-dash yellow line permitted vehicles to pass and he was not aware the rise in Galena Road would have obstructed his view of oncoming traffic.

In January 1995, Sandra Wittenmyer and her husband Rex Wittenmyer filed a lawsuit against Gesell. In October 1995, the Wittenmyers added the County as a defendant, and Gesell filed a third-party contribution complaint against the County.

In February 1998, the County, through its attorneys, Judge, the Judge firm, Dickson, and the Dickson firm, moved for summary judgment in the auto accident case, claiming that "pursuant to section 3—104 of the [Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3—104 (West 1994))], [the] County was absolutely immune from liability." On September 24, 1998, the trial court denied the County's motion for summary judgment, and the case proceeded to a jury trial. On October 30, 1998, the jury returned a verdict in favor of the Wittenmyers. Specifically, the jury awarded $4.5 million in damages to Sandra against Gesell and the County, apportioning 20% of the fault to Gesell and 80% of the fault to the County. The jury also awarded $500,000 in damages to Rex. On Gesell's counterclaim against the County, the jury found the County 50% at fault.

On November 25, 1998, the County filed a posttrial motion and a motion to file a supplemental posttrial motion, alleging its attorneys did not receive the proceedings report until November 24, 1998. On December 1, 1998, the Wittenmyers objected to the County's request to file the supplemental motion, stating the County was represented by two law firms and had sufficient time to file a complete posttrial motion. On December 3, 1998, the trial court denied both of the County's motions.

On December 31, 1998, the County filed a notice of appeal from the judgment entered on the jury verdict and from the trial court's December 3, 1998, denial of its posttrial motions. On the same day, the County filed an emergency motion for leave to file a supplement posttrial motion, stating that, "in light of the impending [January 4, 1999,] appeal deadline, it was necessary for the County to seek, by

way of an emergency motion, leave to file its supplemental post[ ]trial motion, which contained five additional grounds for reversal based upon error committed during the trial." The trial court granted the motion and set a briefing schedule on the supplemental posttrial motion. The last paragraph of the order stated: "Final orders not having been entered in this cause, the time for filing notice of appeal in this matter is hereby extended until a final order is entered."

On January 12, 1999, the County filed an amended supplemental posttrial motion. On February 16, 1999, the trial court denied the amended supplemental posttrial motion, stating: "A. Court has no jurisdiction to hear cause, and alternatively B. Said motion is denied as a matter of substance."

On March 15, 1999, the County filed a motion with the Illinois Appellate Court, Second District, seeking leave to amend its notice of appeal to include the trial court's February 16, 1999, order which denied the County's supplemental postttrial motion. On April 12, 1999, the Second District Appellate Court granted the motion. On May 7, 1999, the Second District Appellate Court vacated its April 12, 1999, order and struck the County's March 15, 1999, amended notice of appeal, stating the grounds raised in the second posttrial motion were untimely. The Second District Appellate Court also denied Gesell and Wittenmyer's motions to dismiss the appeal, finding the County's December 31, 1998, notice of appeal preserved the grounds raised in the County's first posttrial motion.

On July 16, 1999, Gesell filed a motion in the Second District Appellate Court, arguing the County's December 31, 1998, notice of appeal was prematurely filed and the County never filed a new notice of appeal. On December 14, 1999, the Second District Appellate Court issued an unpublished order that reversed its prior ruling that the December 31, 1998, notice of appeal was timely. *Wittenmyer v. Gesell*, No. 2—99—0041 (December 14, 1999) (unpublished order under Supreme Court Rule 23). In its order, the Second District Appellate Court stated that the County was required to withdraw its notice of appeal when it filed its December 31, 1998, supplemental posttrial motion. Further, after the trial court denied the County's posttrial motion on February 16, 1998, the County failed to file a timely notice of appeal. Therefore, the Second District Appellate Court held the County's original notice of appeal was premature and ineffectual, and as a result, the County's March 15, 1999, motion to amend its notice of appeal was also without effect. After the Second District Appellate Court denied the County's request for reconsideration, the County filed a petition for leave to appeal with the Supreme Court of Illinois. On May 31, 2000, the supreme court denied the County's petition. *Wittenmyer v. Gesell*, 189 Ill. 2d 683, 731 N.E.2d 773 (2000).

On April 27, 2001, the County and GIE brought the malpractice suit against defendant attorneys and law firms. Plaintiffs claimed that defendants' failure "to preserve the County's appeal right was a breach of [defendants'] duty to exercise reasonable care, skill[,] and diligence on behalf of plaintiffs, and but for [defendants'] negligence, the appeal would have been successful, and the judgment against the County would have been overturned."

On August 5, 2002, plaintiffs moved for partial summary judgment on the issues of whether defendants owed a duty to plaintiffs and whether defendants breached such a duty. Specifically, plaintiffs argued that the trial court could determine defendants' duty as a matter of law based solely upon the Second District Appellate Court's order in *Wittenmyer v. Gesell*, No. 2—99—0041 (December 14, 1999) (unpublished order under Supreme Court Rule 23). Defendants responded and filed a cross-motion for summary judgment, contending that the issue of duty was one of fact for the jury and could not be proved without expert testimony. On March 20, 2003, after a hearing on the parties' cross-motions for summary judgment, the trial court granted plaintiffs' motion for partial summary judgment, finding defendants owed plaintiffs a duty to perfect the appeal and defendants' failure to do so breached such a duty. The court then set the case for further proceedings on proximate cause and damages issues.

On May 16, 2003, the trial court entered a detailed case-management order governing discovery, dispositive motion practice, and trial dates. On June 22, 2003, defendants moved for partial summary judgment on the issue of proximate cause, arguing that regardless of whether defendants had perfected the appeal, the appeal in the auto accident case would not have been successful. Specifically, defendants claimed that, had the Second District Appellate Court reviewed the County's appeal on the merits, it would not have overturned the Wittenmyer judgment on section 3—104 of the Tort Immunity Act grounds. See 745 ILCS 10/1—101 through 10—101 (West 1994). Defendants also claimed that the trial court should decide the question of whether the appeal would have been successful. On July 16, 2003, plaintiffs filed their response, claiming that they retained Judge for "his expertise in Illinois tort immunity law and road and signage cases" and defendants "knew the tort immunity defense was and is meritorious." Plaintiffs argued that the court should deny defendants' motion for partial summary judgment because the question of the hypothetical outcome of the County's dismissed appeal was a question of fact for the jury.

On October 17, 2003, after a hearing, the trial court ruled that the question of proximate cause in the instant appellate malpractice case

is a question of law that should be decided by the court. Specifically, the court stated "it is my view after reading everything here and relying in part on the [*Environmental Control Systems, Inc. v. Long*, 301 Ill. App. 3d 612, 703 N.E.2d 1001 (1998),] case and on the Michigan [*Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 513 N.W.2d 773 (1994),] case, that [a]ppellate malpractice is a law issue which inherently deprives a plaintiff of a jury trial, as plaintiff suggests, because juries should not be deciding whether or not a party has established it is more likely than not that an [a]ppellate [c]ourt would do something." Following the ruling, the parties agreed that the trial court would set the case for an oral argument consistent with an appellate oral argument and that the court would confine its review to the written briefs that were filed during the dismissed appeal.

On January 16, 2004, the trial court held a hearing, and the parties advocated the immunity arguments that had been presented in the appellate briefs to the Second District Appellate Court. On March 17, 2004, the trial court issued a written opinion granting defendants' partial summary judgment motion, finding plaintiffs' malpractice action lacked the proximate cause element. The court in its order stated as follows: "this court agrees with the defendant[s]' argument that *** plaintiffs are asking this court [to] ignore the language in [section] 3—104 [of the Tort Immunity Act] which protects municipalities only from the failure to initially provide traffic[-]control devices. The protection in [section] 3—104 [of the Tort Immunity Act] refers [*sic*] to a lack of traffic[-]control devices at the particular intersection or roadway[,] not the incorrect placement of those devices." The court concluded that "if [the] County failed to stripe at all [it] would have an immunity under [section] 3—104 [of the Tort Immunity Act], but when [it] acted by striping the road[,] [it] had an obligation to do so in compliance with MUTCD and [it] did not. Therefore, the trial court was correct in denying the *** County [the section] 3—104 immunity. Further, the Second District Appellate Court, in reviewing *** [the trial court's] ruling *de novo*, would have affirmed [the trial court's] decision on immunity." This appeal followed.

## II. ANALYSIS

On appeal, plaintiffs argue that (1) the trial court erred in its ruling that the issue of proximate cause in appellate malpractice cases was a question of law; and (2) assuming the proximate cause issue was a question of law, the court erred in its finding that the proximate cause element was lacking.

### A. Proximate Cause Issue Was an Issue of Law

In contending that the trial court erroneously determined that the

proximate cause issue in appellate malpractice cases was a question of law, plaintiffs argue that such an issue presented a "hypothetical factual inquiry" and was not, as the trial court determined, "a law issue which inherently deprives a plaintiff of a jury trial."

As plaintiff correctly points out, Illinois courts have established that in legal malpractice actions, the issue of proximate causation is generally a question of fact to be decided by the trier of fact. See *Shehade v. Gerson*, 148 Ill. App. 3d 1026, 1031, 500 N.E.2d 510, 513 (1986); *Gelsomino v. Gorov*, 149 Ill. App. 3d 809, 815, 502 N.E.2d 264, 268 (1986); *Renshaw v. Black*, 299 Ill. App. 3d 412, 417-18, 701 N.E.2d 553, 557 (1998); *Environmental Control Systems*, 301 Ill. App. 3d at 621, 703 N.E.2d at 1008. Plaintiffs argue that in this case, the question of whether the alleged appellate malpractice proximately caused plaintiffs' damage was also an issue of fact, and as such, it should have been resolved by the jury. Defendants, however, contend that the proximate cause issue was a question of law because the underlying issue in this case was a question of law and the application of principles of law is inherently a judicial function. We agree with defendants.

■ As this court stated in *Nika v. Danz*, 199 Ill. App. 3d 296, 308, 556 N.E.2d 873, 882 (1990), to succeed in a cause of action for legal malpractice, a plaintiff must prove that but for the defendant's attorney's negligence, he would have been successful in the prosecution or defense of a cause of action involving a third party. The accepted procedure for presenting evidence regarding the underlying action in a legal malpractice action is known as a " 'suit within a suit' " or " 'trial-within-a-trial.' " *Danz*, 199 Ill. App. 3d at 308, 556 N.E.2d at 882, quoting 2 R. Mallen & J. Smith, Legal Malpractice § 27.7, at 641 (3d ed. 1989). The objective of such a procedure is to "establish what the result *should have been*, had the case been filed." (Emphasis in original.) *Danz*, 199 Ill. App. 3d at 308, 556 N.E.2d at 882.

In this case, the alleged malpractice involves defendants' attorneys' failure to perfect an appeal. For plaintiffs to succeed, they must demonstrate that but for defendants' failure, the Second District Appellate Court would have found the Tort Immunity Act protected the County from the verdict. As such, the success of plaintiffs' claim rests upon the question of how the Second District Appellate Court would have interpreted the Tort Immunity Act. Such a determination must be based on the premise that the Second District Appellate Court would have correctly applied the Tort Immunity Act. Therefore, the determination of what the Second District Appellate Court *would* have done can only be based on an analysis of what it *should* have done.

■ This question, how the Second District Appellate Court should

have interpreted the Tort Immunity Act, is a question of law for the court because the Illinois Constitution places the exclusive and entire judicial power in the Illinois court system and the application and construction of state laws is inherently a judicial function. See Ill. Const. 1970, art. VI, § 1; *People v. Bruner*, 343 Ill. 146, 158, 175 N.E. 400, 405 (1931); *Agran v. Checker Taxi Co.*, 412 Ill. 145, 149, 105 N.E.2d 713, 715 (1952). In the instant case, the trial court's determination of the correct interpretation of the Tort Immunity Act and whether the County should be immune does not turn on questions of fact. For example, whether defendants told plaintiffs prior to the appeal of the underlying traffic accident case that the appellate court was likely to reverse based upon tort immunity and whether such statement was truthful does not affect the proper application of the Tort Immunity Act. Therefore, the conclusion that the court correctly determined that the proximate cause issue was an issue of law does not deprive the jurors of their role as fact finders. See *People v. Blue*, 205 Ill. 2d 1, 17, 792 N.E.2d 1149, 1158 (2001).

Moreover, the question determined by the trial court was not, as plaintiffs contend, "whether it is more likely than not that an appellate court would rule in Kendall County's favor." As discussed above, the correct answer to the question of what the Second District Appellate Court would have done had defendants perfected the appeal lies in the correct application of the relevant law. If the County should not have been afforded protection from the verdict under the Tort Immunity Act, then defendants' failure to perfect the appeal was not the proximate cause of the County's damages. Therefore, the question faced by the trial court was not a "hypothetical factual question" for the jury as plaintiffs claim; rather, it was a legal question for the court.

This conclusion is consistent with the Fifth District Appellate Court's holding in *Environmental Control Systems*, 301 Ill. App. 3d 612, 703 N.E.2d 1001, and the Michigan Supreme Court's holding in *Charles Reinhart Co.*, 444 Mich. 579, 513 N.W.2d 773. In both cases, the courts, in determining whether the defendants' attorneys' alleged failure in the appeals of the underlying actions proximately caused the plaintiffs' damages, concluded that whether the underlying appeals would have been successful involves legal analysis, and such analysis is reserved for the courts.

This holding is limited to appellate malpractice actions where the success of the underlying actions rests upon a question of law. The trial court stated in its October 17, 2003, ruling that "appellate malpractice is a law issue which inherently deprives a plaintiff of a jury trial." That issue is not before this court today, and our affirmation of the court's order does not extend to that conclusion.

### B. Section 3—104 Immunity Does Not Apply to the County

Having determined that the proximate cause issue was a question of law, we review *de novo* whether the trial court correctly awarded summary judgment to defendants on the proximate cause issue. See *Sollami v. Eaton*, 201 Ill. 2d 1, 6-7, 772 N.E.2d 215, 218 (2002). Specifically, based on the evidence, did the court correctly determine that section 3—104 of the Tort Immunity Act did not immunize the County from the jury verdicts?

Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2002); *Sollami*, 201 Ill. 2d at 6, 772 N.E.2d at 218. Because summary judgment is a drastic means of disposing of litigation, it should be allowed only when "the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992).

■ Section 3—104 of the Tort Immunity Act provides as follows:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to initially provide regulatory traffic[-]control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings[,] or any other traffic regulating or warning sign, device[,] or marking, signs, overhead lights, traffic separating or restraining devices[,] or barriers." 745 ILCS 10/3—104 (West 1994).

In arguing the trial court erroneously determined that the element of proximate cause was lacking in this case, plaintiffs claim that the above section provided absolute immunity to the County. Plaintiffs acknowledge that the statutory language "insulates a public body in the initial placement of markings" but not "improper placement of markings." Plaintiffs, however, argue that by failing to paint a no-passing line, the County committed a failure of initial placement. Defendants argue that, by painting Galena Road with a skip-dash yellow line that permitted passing, the County committed improper placement of markings. We agree with defendants.

■ Section 11—304 of the Illinois Vehicle Code (Vehicle Code) provided that when placing local traffic-control devices, local authorities "shall" follow the state manual adopted by the Illinois Department of Transportation (IDOT). 625 ILCS 5/11—304 (West 1994). The Illinois Manual on Uniform Control Devices (IMUTCD) consists of the MUTCD and the Illinois Supplement to the MUTCD. The MUTCD states that a normal broken yellow line indicates a two-direction passing zone, and passing is permitted for traffic traveling in either direc-

tion. A one-direction no-passing zone indication, on the other hand, includes a normal broken yellow line and a normal solid yellow line, and passing is only permitted for the traffic traveling adjacent to the broken line.

The above description is consistent with the Illinois Rules of the Road. Chapter eight of the Illinois Rules of the Road, which covers traffic signals and pavement markings, states as follows: "BROKEN YELLOW LINES separate single lanes of traffic moving in opposite directions. Passing is allowed." Further, "[w]hen there is a solid and a broken yellow line separating two lanes of traffic moving in opposite directions, you may pass only when the broken yellow line is nearest [to] your lane." http://www.library.sos.state.il.us/publications/rr/rr_chap08.html (visited January 13, 2005). The above regulations clearly establish that, contrary to the dissent's statement that "[i]t is incorrect to say that a broken yellow line is a passing zone" (356 Ill. App. 3d at 277), a broken yellow line does indicate a passing zone. Such an indication exists regardless of whether a driver can pass on a roadway without a centerline. See 356 Ill. App. 3d at 277. Therefore, a broken yellow line, by itself, is a traffic-control device. On the other hand, a solid yellow line, by itself, is not a traffic device, as both the IMUTCD and the Illinois Rules of the Road have established that a one-way no-passing-allowed signal must include both a broken yellow line and a solid yellow line, and a two-way no-passing-allowed signal has two solid yellow lines.

As Gesell testified at trial, he passed another vehicle in the westbound lane based on the passing-permitted signal then existing on Galena Road and collided head-on with Sandra Wittenmyer's vehicle. As a result of the collision, Sandra Wittenmyer suffered severe and permanent injuries, and a jury later found the County 80% at fault. These facts demonstrate that, despite the dissent's assertion that "[t]he absence of the solid yellow line does not interfere with the integrity of the broken yellow line" (356 Ill. App. 3d at 277-78), such an absence gave the erroneous traffic indication on Galena Road and caused the accident. Further, the markings on the road indicated that passing was allowed, and therefore the County's underlying liability did not result from its failure to indicate whether passing was allowed. On the contrary, the County's liability stemmed from its placement of an erroneous traffic signal indicating passing was allowed. Such an error was an "improper placement" and not an "initial failure to place."

■ Plaintiffs also argue the Supreme Court of Illinois's decisions in *West v. Kirkham*, 147 Ill. 2d 1, 588 N.E.2d 1104 (1992), support its position that the County was protected by the Tort Immunity Act. In *West*, the plaintiff suffered an injury when, in the process of making a

left turn, her vehicle collided with another vehicle. *West*, 147 Ill. 2d at 3, 588 N.E.2d at 1105. The plaintiff sued the city of Urbana, Illinois, claiming the city had a statutory duty to provide a left-turn arrow for her direction of traffic. Specifically, the plaintiff argued that because the city had installed a left-turn arrow for traffic traveling in the opposite direction at the intersection where the accident occurred, the city's error was an "improper placement." *West*, 147 Ill. 2d at 3-4, 588 N.E.2d at 1105. The Supreme Court of Illinois disagreed, finding the plaintiff's claim fits squarely within the immunity granted by section 3—104 of the Tort Immunity Act and the city is not liable for its failure to "provide a particular traffic device." *West*, 147 Ill. 2d at 6, 588 N.E.2d at 1106. Further, the supreme court stated as follows:

"Section 1—101.1 of the Act states the expressed purpose of the Act. According to that section, the Act is intended to 'protect local public entities and public employees from liability arising from the operation of government.' (Ill. Rev. Stat. 1987, ch. 85, par. 1—101.1(a).) The 'operation of government' necessarily encompasses the policy decisions made by a municipality; that is, those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. The decision whether to install a traffic signal requires the municipal traffic planner to balance a host of competing interests, among them, safety, convenience[,] and cost. *** [T]his is not the sort of decision that should be second-guessed by the courts. Were such second-guessing permitted, the traffic planner would be more concerned with avoiding possible litigation than with using his best judgment to properly balance the competing interests. Thus, instead of seeking the best balance of safety, convenience[,] and cost, the traffic planner would concern himself only with whether it could later be argued that the regulation provided could have possibly been safer. Excessive regulation, with no corresponding gain in safety, convenience[,] or cost efficiency, would be the natural result. The legislature recognized this by enacting section 3—104 and expressly immunizing the failure to provide a traffic[-]control device or sign." *West*, 147 Ill. 2d at 11-12, 588 N.E.2d at 1109.

However, plaintiffs' reliance on *West* is misplaced.

■ First, unlike the defendant's alleged failure to install a left-turn signal in *West*, the County here placed the wrong traffic signal on the road, one that had the opposite traffic-directing function. Since section 3—104 of the Tort Immunity Act only protects a municipality's "failure to initially provide" a particular traffic device (745 ILCS 10/ 3—104 (West 1994)), the County's mistake here is not protected by this immunity. Second, unlike the *West* case where the "creative"

plaintiff "circumvent[ed] section 3—104 [of the Tort Immunity Act] by finding *** some *other* traffic device that *was* provided," the County's mistake in the instant case involved the erroneous painting of one traffic signal, *i.e.*, the centerline of the road. (Emphases in original.) *West*, 147 Ill. 2d at 10, 588 N.E.2d at 1108. Third, the MUTCD guideline states: "markings that are no longer applicable for roadway conditions or restrictions and that might cause confusion for the road user shall be removed or obliterated to be unidentifiable as a marking as soon as practical." As the record indicates, the County's failure to correct the passing-permitted indication was not a result of its traffic planner's balancing "a host of competing interests, among them, safety, convenience[,] and cost," and the County's liability did not stem from its "operation of government." *West*, 147 Ill. 2d at 11, 588 N.E.2d at 1109. Instead, the County's failure to correct was simply a negligent oversight, and such a failure is not "in itself[,] a decision." 356 Ill. App. 3d at 278. Because of the above distinctions, to hold the County liable in the instant case does not reflect the type of second-guessing that *West* prohibits.

The above conclusion is further supported by the Supreme Court of Illinois's holding in *Snyder v. Curran Township*, 167 Ill. 2d 466, 657 N.E.2d 988 (1995). In *Snyder*, the supreme court stated that it is the long-standing common-law principle that, "although a governmental agency has discretion in determining whether to perform a public work or make an improvement, once the decision to perform the work is made, it must be done with reasonable care and in a nonnegligent manner." *Snyder*, 167 Ill. 2d at 474-75, 657 N.E.2d at 993. In the instant case, once the decision to repaint the highway following an engineering study was made, the repainting must be done in a non-negligent manner. We agree with the dissent that "[e]very roadway could be made safer." 356 Ill. App. 3d at 278. However, contrary to the dissent's interpretation, the County's liability did not result from its "failure to build the best possible roadway" (356 Ill. App. 3d at 278) but rather from its failure to paint the road nonnegligently. Such a failure rendered the initial-failure-to-place immunity inapplicable.

To conclude, the County improperly placed an erroneous passing-permitted signal on Galena Road. Because the clear language of section 3—104 of the Tort Immunity Act only protects the County from its initial failure of placement, the County is not immune from its improper-placement liability. The trial court, therefore, correctly granted summary judgment to defendants on the proximate cause issue.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed

KNECHT, J., concurs.

PRESIDING JUSTICE COOK, dissenting:

I respectfully dissent. I disagree that the County's actions were not covered by section 3—104 immunity.

Standard roadways in Kendall County have broken yellow center-lines. A no-passing zone is created by the addition of a solid yellow line. There was never a solid yellow line at the scene of this accident. It is clear that the County's failure to designate this area as a no-passing zone, its failure to paint a solid yellow line, was "the failure to initially provide" a regulatory traffic-control device, for which section 3—104 affords immunity.

The majority seeks to avoid section 3—104 by semantics, the argu-ment being that the County did not initially *fail* to place a no-passing zone, it "improperly *placed*" a passing zone (the standard broken yel-low centerline). (Emphasis added.) 356 Ill. App. 3d at 276. Under similar logic, the failure to place a reduced-speed sign is actually the placement of a continued-speed sign. That logic is contrary to the express language of section 3—104. See 745 ILCS 10/3—104 (West 1994) ("speed restriction signs"). The majority's decision is contrary to *West.* "The creative plaintiff, seeking to premise an action on the failure to provide a particular traffic device, could always circumvent section 3—104 by finding and pointing out some *other* traffic device that *was* provided." (Emphases in original.) *West,* 147 Ill. 2d at 10, 588 N.E.2d at 1108.

It is incorrect to say that a broken yellow line is a passing zone. Rather, the absence of a solid yellow line is a passing zone. Even a roadway without a centerline is a passing zone. All sorts of conduct is allowed on roadways with broken yellow lines: driving the maximum speed is allowed, nighttime driving is allowed, and truck traffic is al-lowed, to give just a few examples. But we would not say that a broken yellow line is a maximum-speed-permitted line, or a nighttime-driving-permitted line, or a truck-traffic-permitted line. It is true that a municipality is not allowed to put up half a sign. For example, a municipality is not allowed to provide a green light for east-west traf-fic at an intersection without providing a red light for north-south traffic. This case involves nothing like that, however. The absence of the solid yellow line does not interfere with the integrity of the broken

yellow line. In like manner, the installation of a left-turn signal for northbound traffic does not require the installation of a left-turn signal for southbound traffic. See *West*, 147 Ill. 2d at 10, 588 N.E.2d at 1108. A northbound left-turn signal can be operated without the installation of a southbound left-turn signal.

The MUTCD guidelines do note that passing is permitted where there is a broken yellow centerline, but that reference seems to be one of emphasis, in a section designed to clarify passing and nonpassing situations. Even if the drafters of the guidelines intended their language to control this case in the manner suggested by the majority, I am unaware of any authority that allows the MUTCD guidelines to overrule the statutory tort immunity of section 3—104. The majority asserts that once the roadway was repainted after the MUTCD guidelines were changed in 1984, "the repainting must be done in a nonnegligent manner." 356 Ill. App. 3d at 276. The change in guidelines suggests that the length of no-passing zones is a matter of debate. In any event, this is not a case where the County installed the wrong no-passing zone. This is a case where the County did not put in a no-passing zone at all. The majority assumes that the County did not engage in any decision-making in determining not to install a no-passing zone at this location. I suggest the majority has it backward; the failure to religiously keep up with the most recent MUTCD guidelines is in itself a decision. Informal decisions are still decisions; decision-making does not require a committee hearing and vote.

This court has previously attempted to read the words "failure to initially provide regulatory traffic[-]control devices" out of section 3—104 (745 ILCS 10/3—104 (West 1994)). *Snyder v. Curran Township*, 267 Ill. App. 3d 174, 641 N.E.2d 3 (1994). The supreme court told us we were wrong. See *Snyder*, 167 Ill. 2d at 477, 657 N.E.2d at 994 ("strictly the province of the General Assembly"); *Corning v. East Oakland Township*, 283 Ill. App. 3d 765, 769-71, 670 N.E.2d 350, 353-54 (1996). Immunity for failure to act is essential to the operation of government. Every roadway could be made safer. Two-lane roadways could be made four-lane. Four-lane roadways could be divided. Stop signs could be replaced with stoplights. If there is liability for failure to build the best possible roadway, the municipality's only choice may be not to build the roadway. That decision, of course, carries its own consequences. See *Tinder v. Illinois Power Co.*, 325 Ill. App. 3d 606, 610, 758 N.E.2d 483, 487 (2001) (not a breach of duty to supply electricity; benefits outweigh disadvantages). Is the community better served by a two-lane unlighted roadway or no roadway at all? Allowing the imposition of liability because something more could have been added creates a staggering burden for municipalities.

One way for the County to avoid liability for the failure to establish no-passing zones is to put them everywhere. As *West* points out, that is exactly what section 3—104 was designed to prevent. "Were such second-guessing permitted, the traffic planner would be more concerned with avoiding possible litigation than with using his best judgment to properly balance the competing interests." *West*, 147 Ill. 2d at 12, 588 N.E.2d at 1109. "The decision whether to install a traffic signal requires the municipal traffic planner to balance a host of competing interests, among them, safety, convenience[,] and cost." *West*, 147 Ill. 2d at 11, 588 N.E.2d at 1109. Safety is only one of the factors that may be considered. It should not make any difference that a municipality could have laid out a road better; the question is whether there was something wrong in what it did. Once a municipality has provided a traffic-regulating device, it has a duty to maintain that device in a reasonably safe condition. The failure to initially provide a device, however, cannot be the basis for liability.